796 A.2d 778

**In re ADOPTION/GUARDIANSHIP NOS. J9610436 and J9711031 in the Circuit Court for Carroll County.**

No. 58, Sept. Term, 2001.

Court of Appeals of Maryland.

April 16, 2002.

Fred S. Hecker (MacDonald & Hecker, P.A., on brief), Westminster, for petitioner.

Nancy C. Hopkins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Debra Gardner, Deborah Thompson Eisenberg, Lewis Yelin, Public Justice Center, Lauren Young, Kenneth Wardlaw, Maryland Disability Law Center, Stephen H. Sachs, Wilmer, Cutler & Pickering, Baltimore, brief of Amici Curiae, the Public Justice Center, The Maryland Regional Practitioners' Network for Fathers and Families and (As to Part I Only): The Maryland Law Center, The Arc of Anne Arundel County, The Arc of Maryland, The Arc of the United States, Independence Now, Making Choices for Independent Living, Maryland Adapt, Maryland Statewide Independent Living Council, and People on the Go of Maryland for petitioners, amici curiae

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

CATHELL, Judge.

Prior to a termination of parental rights, the parent and perhaps the child have fundamental federal and state constitutional rights to the maintenance of the parent/child relationship. This relationship, absent constitutional amendments, cannot be unreasonably abrogated by federal or state statutes, federal or state regulations, administrative practices, by the need to qualify for federal or state funds, or by the "safer course doctrine." These rights are the same where parents or children are alleged to be disabled. Under our Constitutions, the poor and the disabled are no less citizens entitled to the full range of constitutional protections. The Constitutions apply in the social welfare area as fully as in any other area of American life. There is a strong presumption in matters relating to termination of parental rights cases, that the "best interests" of a child, generally, are met by not terminating the parental rights of natural parents. In termination of parental rights cases, it is this presumption that most insures the proper deference to a parent's fundamental and constitutional right to parent. It is from this perspective that we commence our review of this case.

## I. Parenting as a Fundamental Right

Certain fundamental rights are protected under the Constitutions. Among those rights is the right to child rearing, *i.e.*, parenting. Supreme Court case law has consistently reaffirmed parental rights.

We recently stated in *Boswell v. Boswell*, 352 Md. 204, 217–20, 721 A.2d 662, 668–69 (1998), that:

"A parent has a fundamental right to the care and custody of his or her child. The United States Supreme Court has upheld the rights of parents regarding the care, custody, and management of their children in several contexts, including child rearing, education, and religion. *See Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d

15 (1972) (overturning a mandatory schooling law in the face of Amish claims of parental authority and religious liberty); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (discussing the right of parents to raise their children); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944) (observing that 'the custody, care, and nurture of the child reside first in the parents'); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942) (stating the right to rear a child is encompassed within a parent's 'basic civil rights').... The Supreme Court's long history of affording protection to parents in the realm of child rearing and family life was acknowledged in *Wolinski v. Browneller,* 115 Md.App. 285, 299, 693 A.2d 30, 36–37 (1997):

'A parent's Fourteenth Amendment liberty interest in raising his or her children as she sees fit, without undue interference by the State, has long been a facet of that private realm of family affairs over which the Supreme Court has draped a cloak of constitutional protection.'

In accordance with the Supreme Court, Maryland has declared that a parent's interest in raising a child is a fundamental right that cannot be taken away unless clearly justified.

. . .

... [T]his Court has held that the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute.... The best interest standard does not ignore the interests of the parents and their importance to the child. We recognize that in almost all cases, it is in the best interests of the child to have reasonable maximum opportunity to develop a close and loving relationship with each parent." [Some citations omitted.]

*See Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *see also Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Jacobson v. Massachusetts,* 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905).

Most recently, in *In re Mark M.*, 365 Md. 687, 705, 782 A.2d 332, 342–43 (2001), this Court reiterated the notion of parenting as a fundamental right:

"A parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court. The United States Supreme Court has long avowed the basic civil right encompassed by child rearing and family life. *See Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57 (2000) (stating that 'the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children'); *See also Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982) (discussing 'the fundamental liberty interest of natural parents in the care, custody, and management of their child'); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972) (stating that '[t]he rights to conceive and to raise one's children have been deemed "essential," ' and that '[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment ... the Equal Protection Clause of the Fourteenth Amendment ... and the Ninth Amendment ...'" (internal citations omitted)). Maryland, too, has declared a parent's interest in raising a child to be so fundamental that it 'cannot be taken away unless clearly justified.' *Boswell v. Boswell,* 352 Md. 204, 218, 721 A.2d 662, 669 (1998) (citing *In re Adoption No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994))."

In *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the Supreme Court of the United States reaffirmed the rights of parents when there are allegations of neglect and they are involved in a proceeding to terminate their parental rights. Prior to *Santosky,* some states had terminated parental rights based upon a minimal standard of a "fair preponderance of the evidence." In *Santosky,* the Supreme Court held that, "the 'fair preponderance of the evidence' standard ... violates the Due Process Clause of the Fourteenth Amendment." *Id.* at 768, 102 S.Ct. at 1402, 71

L.Ed.2d at 616. The Court concluded that in order to terminate a parent-child relationship, a "clear and convincing evidence" standard of proof was needed. Before the Court addressed the proper standard to use in termination proceedings, it again recognized the weight given to parental rights:

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the *irretrievable* destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs."

*Id.* at 753, 102 S.Ct. at 1394–95, 71 L.Ed.2d at 606 (emphasis added).

The applicable State laws, in order to meet the requirements of the Federal Constitution and Article 24 of the Maryland Declaration of Rights, contain certain protections for parents. First, Maryland law presumes that reunification with the natural parent is in the child's "best interest." Additionally, Maryland's law requires that the court must consider the nature and extent of services offered by the child placement agency to facilitate reunion of the child with the natural parent prior to a termination of parental rights. Specifically, Maryland Code (1984, 1999 Repl.Vol.), section 5–313 of the Family Law Article, the section at issue in this case, bolsters Maryland's already stringent statutory standards that must be satisfied before termination of parental rights can occur.

Not only have Maryland courts long recognized this notion of the fundamental right to rear a child, but the courts have emphasized that this fundamental right may not be terminated unless clearly justified. In *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 105, 642 A.2d 201, 204 (1994), we noted: "Maryland receives considerable federal funds pursuant to

this [federal] Act.[1] Accordingly, the Maryland General Assembly has enacted legislation to comply with the federal requirements." "One of the most important purposes of this law was to eliminate foster care drift by requiring states to adopt statutes to facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs." *Id.* at 104, 642 A.2d at 204. Nonetheless, we held that: "First and foremost, the department must consider returning the child to the child's natural parents or guardians." *Id.* at 105, 642 A.2d at 204–05.

Kathleen A. Bailie, *The Other "Neglected" Parties in Child Protection Proceedings: the Parents in Poverty and the Role of the Lawyers Who Represent Them,* 66 Fordham L.Rev. 2285, 2293–2331 (May, 1998) notes problems with the application by local agencies of the Act's provisions:

"[T]he [Adoption and Safe Families Act of 1997(ASF) ], which shortens the time that families have to work toward reunification and speeds up the termination of parental rights and adoption processes, was passed largely in reaction to the most terrible cases of child abuse [2] in our nation. While concern for the safety and well-being of the nation's children is a laudable goal, the ASF may actually harm some children in the process: Because this new piece of federal legislation mainly contemplates cases of severe child abuse and maltreatment, poor families who are in the child welfare system because of suspected neglect may soon be ignored.

Cases that involve poverty as neglect are perhaps the most compelling candidates for family preservation and reunification services. Unfortunately, poverty is also a deeply-rooted problem and, thus, one that cannot be alleviated quickly. As such, the ASF's new time lines for child protective cases may actually work to tear apart families

---

1. This "Act" is the "Adoption Assistance and Child Welfare Act of 1980," codified at 42 U.S.C. sections 670–679 (1988).

2. There is no evidence of child abuse in the case *sub judice.*

who would otherwise have succeeded in rebuilding their lives.

. . .

Finally, charges of neglect effectively render poor parents powerless. The strain of having one's children taken away is extremely distressing for parents in poverty, who are often undereducated and unworldly. This stressful situation weakens parents and, therefore, further exacerbates the imbalance of power that already favors the state in child protection proceedings. The state is clearly in control in neglect proceedings, for not only does it present the case to the court, but its 'adversary,' the parent, is unfamiliar with the intricacies of the legal proceedings. As such, parents are often unable to effectively assert their rights.

. . .

The newest piece of federal legislation affecting the child welfare system—The Adoption and Safe Families Act of 1997—may continue to disserve poor and needy families. Intended to make children's health and safety the primary focus of child protective proceedings, the ASF forces child welfare officials to give up on parents sooner than before. Because indigent parents may have difficulty correcting their families' situations with the speed with which the federal government now requires, the ASF may actually work to hurt children by dissolving loving, salvageable families." [Alterations in original.] [Endnotes omitted.]

Additionally, although we need not decide its applicability in the present case, Congress has also recognized that the rights of the disabled are no less protected. The Americans With Disabilities Act is an expression of federal public policy in all areas.[3] Chris Watkins, *Beyond Status: The Americans with*

---

**3.** The amicus brief filed in this case also notes the applicability of the Americans with Disabilities Act ("ADA"). It asserts that it should be applicable in the area of termination proceedings where the parents are disabled.

*Disabilities Act and the Parental Rights of People Labeled Developmentally Disabled or Mentally Retarded,* 82 Cal. L.Rev. 1415, 1469 (1995), notes:

> "Title II essentially protects all qualified individuals with a disability from discrimination in the programs and activities of all public entities, including state legislatures and courts.
>
> . . .
>
> There is nothing in the regulatory language to suggest that this directive should not apply to legislatures enacting laws, or to judges making decisions about parental rights."

Accordingly, when attempting to comply with the Adoption and Safe Families Act of 1997, agencies and the courts, must, at the least, recognize that Congress has also expressed a concern that extra steps be taken to insure that the disabled are not subject to discrimination, however inadvertent it may be in a given case.

Due to the importance and role of the federal and state statutes generally and in this case specifically, and because it is also within the context of the federal Adoption Assistance and Child Welfare Act of 1980 and Title 5 of the Maryland Family Law Article that we address the case *sub judice,* we include a portion of *In re: Adoption/Guardianship No. 10941,* 335 Md. 99, 103–06, 642 A.2d 201, 203–05 (1994). Judge Karwacki, writing for the Court, comprehensively addressed the state and federal statutory scheme relating to child adoption, which can lead, as it did here, to the potential termination of parental rights. Judge Karwacki stated:

> "The Maryland General Assembly has enacted a comprehensive statutory scheme to address those situations where a child is at risk because of his or her parents' inability or unwillingness to care for him or her. Title 5 of the Family Law Article of the Maryland Code (1984, 1991 Repl.Vol.) (hereinafter 'F.L.') governs the custody, guardianship, adoption and general protection of children who because of abuse

or neglect[4] come within the purview of the Department of Human Resources. . . .

. . .

During the 1970's, nationwide concern grew regarding the large number of children who remained out of the homes of their biological parents throughout their childhood, frequently moved from one foster care situation to another, thereby reaching majority without belonging to a permanent family. This phenomenon became known as 'foster care drift' and resulted in the enactment by Congress of Public Law 96–272, the 'Adoption Assistance and Child Welfare Act of 1980,' codified at 42 U.S.C. §§ 610–679 (1998). One of the importance purposes of this law was to eliminate foster care drift by requiring states to adopt statutes to facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs.

Under the federal act, a state is required, among other things, to provide a written case plan for each child for whom the state claims federal foster care maintenance payments. 42 U.S.C. § 671(a)(16). The case plan must include a description of the home or institution into which the child is placed, a discussion of the appropriateness of the placement, and a description of the services provided to the parents, child and foster parents to facilitate return of the child to his or her own home or to establish another permanent placement for the child. 42 U.S.C. § 675(1). The state must also implement a case review system that provides for administrative review of the case plan at least every six months and judicial review no later than eighteen months after placement and periodically thereafter. 42 U.S.C. § 675(5)(B) and (C). The purpose of the judicial

---

4. The term "neglect" implies, generally, a deliberate or knowing neglect. In the case at bar, a knowing neglect has never been established. The record supports that the father attempted to care for his children; he did not neglect to make efforts to care for them.

review is to 'determine the future status of the child' including whether the child should be returned to its biological parents, continued in foster care for a specified period, placed for adoption, or because of the child's special needs or circumstances, continued in foster care on a long term basis. 42 U.S.C. § 675(5)(C).

Maryland receives considerable federal funds pursuant to this Act. Accordingly, the Maryland General Assembly has enacted legislation to comply with the federal requirements. Under Maryland's statutory scheme, for those children committed to a local department of social services the department is required to develop and implement a permanency plan that is in the best interest of the child. F.L. § 5–525.

In developing the permanency plan, the department is required to consider a statutory hierarchy of placement options in descending order of priority. F.L. § 5–525(c). First and foremost, the department must consider returning the child to the child's natural parents or guardians. If reunification with the biological parents is not possible, the department must consider placing the child with relatives to whom adoption, guardianship, or care or custody, in descending order of priority, are planned to be granted. If placement with relatives is not possible, then the department must consider adoption by a current foster parent or other approved adoptive family. . . .

. . . If the circuit court finds by clear and convincing evidence, after considering the statutorily enumerated factors, that it is in the best interest of a child previously adjudicated a CINA for parental rights to be terminated, the circuit court has authority to grant the department's petition for guardianship. Such award carries with it the right for the department to consent to the adoption of the child. F.L. §§ 5–311 and 5–317(f).

The overriding theme of both the federal and state legislation is that a child should have permanency in his or her life. . . . Thus, Title 5 of the Family Law Article seeks to prevent the need for removal of a child from its home, to return a child to its home when possible, and where re-

turning home is not possible, to place the child in another permanent placement that has legal status." [Some citations omitted.]

We now turn to the facts of the case *sub judice.*

## II. Procedural History

On July 10, 1997, the Carroll County Department of Social Services (CCDSS) filed a Petition for Guardianship with the Right to Consent to Adoption or Long–Term Care Short of Adoption of Mr. F.'s (petitioner) minor children, Tristynn D. (Tristynn) and Edward F. (Edward), and for the termination of petitioner's parental rights as to the minor children. The children's natural mother, Ms. H., consented to the termination of her parental rights as to both children prior to the filing of the petition. The termination of parental rights (TPR) hearing began on June 23, 1998 and took a total of five days over the course of more than a year.[5] On August 22, 2000, following the conclusion of the hearings, the Circuit Court for Carroll County issued a Memorandum and Order terminating petitioner's parental rights and granting CCDSS guardianship of the minor children with the right to consent to adoption and/or long-term care short of adoption. Petitioner noted a timely appeal to the Court of Special Appeals from that Order. In an unreported opinion, the Court of Special Appeals affirmed the trial court's judgment.[6]

On June 11, 2001, petitioner filed a Petition for Certiorari and the Public Justice Center filed a Petition and Memorandum in Support thereof and asked to participate as amici curiae. We granted both petitions on August 15, 2001. Peti-

---

5. Specifically, the hearing dates were: June 23, 1998, June 24, 1998, January 29, 1999, July 16, 1999, and July 20, 1999.

6. Chief Judge Murphy, dissenting, commented, in part, "Rare are the cases in which parental rights are terminated on the ground that, even 'though the [parent's] effort and desire [to be a good parent] is there, the [parent's] ability simply is not.' In these rare cases, every reasonable effort should be made to assist the parent and termination should be the very last resort. . . ." *In re Adoption/Guardianship Nos. J9610436 and J9711031,* No. 1579 (Court of Special Appeals May 11, 2001) (Dissent, C.J. Murphy).

tioner presents, in his brief to this Court, the propriety of the trial court's termination of his parental rights. For the reasons stated herein, we reverse the orders of the trial court and intermediate appellate court that terminated petitioner's parental rights.

## III. Statement of Facts

The oldest of the two sons, Tristynn, was born on June 18, 1995 to petitioner and Ms. H. who were never married and their relationship at the time of the births of both children was apparently volatile. Petitioner testified that he has permanently terminated his relationship with Ms. H. and avoids contact with her. There was no evidence in the record to the contrary. Mrs. H. ultimately abandoned the children and consented to termination of her parental rights. In consolidated cases J–96–10436 and J–96–10624, each child was adjudicated to be in need of assistance.[7]

For approximately six months after his birth, Tristynn lived with petitioner and Ms. H. Tristynn subsequently came into the care of CCDSS on December 28, 1995, at the age of six months, when petitioner went to CCDSS and asked for help in caring for his child. Petitioner testified that there was no electricity in the apartment where the family had been living at the time he brought Tristynn to CCDSS and that he had no food to feed Tristynn. There was no other evidence bearing on the issue of neglect and no evidence of abuse. Petitioner stated that "[I] thought [I] was going to get [my] kids back once [I] got [my] electricity turned back on." When his children were not returned to him, an adversarial relationship between petitioner and CCDSS came into existence.

CCDSS placed Tristynn in foster care, and on April 25, 1996 Tristynn went to live with his maternal aunt and uncle, Mr. and Mrs. W. Eventually, on April 30, 1997, Mr. and Mrs. W. told CCDSS that they could no longer care for Tristynn; he

---

7. Tristynn was found to be a Child in Need of Assistance (CINA) in Juvenile case J–96–10436 by Order dated March 21, 1996 and Edward was found to be a CINA in Juvenile Case No. J–96–10624 on August 6, 1996.

was then placed with petitioner's aunt and uncle, who were licensed foster care parents.[8]

On May 30, 1996, Edward was born and he tested positive at birth for amphetamines and had severe medical problems. Edward was treated for two weeks in the neonatal intensive care unit at Johns Hopkins Hospital. Edward's mother abused alcohol, over the counter medication, and marijuana during her pregnancy, but it is not certain whether her behavior caused Edward's medical conditions. Edward entered the care of CCDSS on June 18, 1996 when he was three weeks old, at which time he was immediately placed in foster care with non-relatives Mr. and Mrs. M.[9]

The initial permanency plan for both children was to return them to the home of either parent. On May 13, 1997, petitioner was informed that CCDSS's permanency plan had changed from a plan of reunification to guardianship with the right to consent to adoption. That plan was adopted by the court on June 10, 1997.

■ The adequacy of the reunification services provided to petitioner by CCDSS are disputed. CCDSS claims that the services provided to petitioner were adequate and ultimately unsuccessful. We shall hold that they were not adequate. Specifically, CCDSS states that shortly after Tristynn entered foster care, CCDSS began arranging for him to have supervised visits with petitioner,[10] and CCDSS claims that they had scheduling problems with petitioner from the beginning of the

---

8. Tristynn continues to live with petitioner's aunt and uncle at the time of this decision, and they are interested in adopting Tristynn. It should be noted that for a brief period of time, December 10, 1996 through March 1, 1997, Tristynn was removed from the care of Mr. and Mrs. W. and was placed with his mother in aftercare, amounting to a gap in time between April 25, 1996 and April 30, 1997 when Tristynn was placed with petitioner's aunt and uncle.

9. Edward continues to reside with Mr. and Mrs. M., both of whom are interested in adopting Edward.

10. In fact, it was roughly four months after Tristynn entered foster care before CCDSS arranged for petitioner to begin supervised visits with Tristynn.

visitation. CCDSS testified that the initial visitation schedule had to be changed frequently to accommodate petitioner's work schedule and that on at least one occasion petitioner cancelled a visit at the last minute. Further, CCDSS claims that during his early visits with the children, petitioner demonstrated trouble in caring for the children, was unable to remember child care techniques repeatedly shown to him by the social worker, had difficulty in choosing age-appropriate toys for the children, and was not able to help Tristynn with his beginning verbal skills. Moreover, CCDSS states that in later supervised visits when petitioner started seeing Tristynn and Edward together, petitioner needed supervision and direction to understand how to properly care for the two children, how to give them both proper attention when the children are together, and to understand the special medical and dietary needs of Edward.

Additionally, CCDSS states that other than visitation, petitioner did not request additional services from CCDSS, and went so far as to deny his need for services. The social worker assigned to assist petitioner claimed petitioner was not cooperative, was not truthful, and provided inadequate information.

Finally, unlike CCDSS's usual practice of entering into a new service agreement every six months with those seeking assistance, CCDSS entered into only one Social Services Agreement with petitioner (on July 3, 1996) that had the goal of reunification. The agreement required petitioner to obtain electricity in his apartment, attend parenting classes, complete a domestic violence program, complete an alcohol and drug evaluation, submit to random urine analysis, confirm in advance his intent to keep scheduled visits, be completely truthful with the CCDSS, and remain drug and alcohol free.[11]

Petitioner attended parenting classes, as well as a parents anonymous group, but the social worker believed that petition-

---

11. The record does not indicate that petitioner was involved in domestic violence in respect to either of the children or had any drug or alcohol addictions from which to remain free.

er made very little progress. Petitioner finished the first phase of a domestic violence program, but allegedly could not complete the second phase due to his alleged cognitive limitations. Also, petitioner completed a drug and alcohol evaluation, with the evaluator concluding that he did not need treatment.

A social worker also noted that petitioner never prepared a household budget, presumably for when reunification occurred, or came up with a plan for child care other than suggesting that a family member living close by could care for them. According to CCDSS, petitioner has a reduced mental capacity that renders him incapable of parenting the children on his own.

Insofar as we have been able to discern from the record, CCDSS never offered any specialized services designed to be particularly helpful to a parent with the intellectual and cognitive skill levels CCDSS alleges are possessed by petitioner. We are informed by the amicus brief that such services are available. They include, according to petitioner's expert witness, Mr. Hardesty: [12] "case management services," "family and individual support services," "community supported living arrangement services," "drop in services," and "Division of Vocational Rehabilitation" services. Other witnesses testified that financial advising services, family support services, and other programs were available from various entities such as Chance, Flying Colors to Success, Target, various Association Retarded Citizens (ARC) entities, and numerous other entities, private and public. None of these services were utilized by CCDSS.[13] Moreover, the record does not reflect that CCDSS sought to utilize services that might be available

---

12. Mr. Hardesty was specifically qualified as an expert in developmental disabilities.

13. The amicus brief also describes state licensed Developmental Services Groups, the Growing Together Program of Parents and Children Together, and The Infants and Toddlers Program through public school systems.

through the Developmental Disabilities Administration, even though it was relying in its drive toward termination on the fact that in the opinion of its workers, petitioner was disabled by reason of mental impairment. (Their term, not ours.) [14] We emphasize that a person of one particular intelligence quotient level may be different from another, but neither of them is impaired or enhanced. He or she is simply what they are. There are no inherently lesser beings in the eyes of the law.

Petitioner counters the allegations of CCDSS that they provided him with sufficient services by claiming that the

---

14.

"It is very hard to go through life with a label. You have to fight constantly. Retarded is just a word. We have to separate individuals from the word. We use words like 'retarded' because of habit—just like going shopping every week and getting up in the morning. The word 'retarded' must be there if you are going to give people help, but what the hell is the sense of calling someone retarded and not giving them anything?

If the label is not used to help, it is inevitably used to hurt. Unless that is the aim, unless the goal is in fact the diminishment of the mentally retarded labeled parent, the label has almost no place in child welfare law."

Robert L. Hayman, Jr., *Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent*, 103 Harv. L.Rev. 1202, 1269 (1990) (endnote omitted).

"In the cause for humanity, we must agree that:

All men are human beings.

All human beings are valuable.

And all the rest is commentary."

*Id.* at 1202, quoting Burton Blatt, *In and Out of Mental Retardation* 95 (1981).

"FROM the perspective of the law, the mentally retarded parent is an oxymoron-in-waiting. Each mentally retarded parent faces the substantial likelihood that, by legal prescription, she will soon no longer be. The class of mentally retarded parents, meanwhile, drifts toward a eugenicist vision: due in large part to the systematic termination of their parental rights—one of the law's more vulgar fictions—and in small part to some strategic definitional retreats, utter extinction of the class is not altogether improbable. Three generations must have been enough after all; the law has said as much.

... In removing children from 'mentally retarded' labeled parents, and in terminating those parents' parental rights, the law gives effect to a conception of human worth that ultimately diminishes us all."

*Id.* at 1203 (endnotes omitted).

services offered by CCDSS to him were minimal, inadequate, and inappropriate for his particular situation. Moreover, petitioner proffers that he has completed his education, obtained a driver's license, has secured employment, and maintains his own residence, indicating that he can, in fact, parent his own children.

Specifically, petitioner claims that while CCDSS did refer him for parenting classes, asked for him to complete a domestic violence program, and referred him for a drug and alcohol evaluation, CCDSS failed to offer petitioner services in a significant manner—in a manner reasonable for him. In other words, CCDSS did not offer reunification services tailored to address petitioner's alleged needs. Petitioner asserts that CCDSS did not fulfill its role as a social service department by seeking out programs specific to petitioner's parenting deficiencies, programs that would aid in the primary and ultimate goal of reunification. The failure, it is argued, of CCDSS to address its services to his specific need has a discriminatory impact.

We note that CCDSS apparently did not even offer petitioner services to assist him with literacy, even after petitioner signed the July 3, 1996 Social Services Agreement and fulfilled the obligations it set forth. Petitioner emphasizes how, even after CCDSS changed from a plan for reunification to a plan for guardianship with the right to consent to adoption, he continued to attend parenting classes, participate in Parent's Anonymous, and continued all that he had been doing, including visiting on a regular basis.[15] Additionally, until the decision by the Court of Special Appeals, petitioner visited with both children consistently, for roughly two hours per week. He was doing all he was asked to do, and proffers that he was not being offered participation in numerous programs that

---

**15.** Petitioner also continued these activities after the new plan was adopted by the Circuit Court and after CCDSS filed a Petition for Guardianship with the Right to Consent to Adoption or Long Term Care Short of Adoption and for the termination of petitioner's parental rights.

should have been offered to the type of person he was alleged to be by CCDSS.

Additionally, there was evidence that in the fall of 1997, at CCDSS's request, Neil Blumberg, M.D., conducted a psychiatric evaluation of petitioner. Dr. Blumberg reported [16] that petitioner suffered from a serious intellectual impairment and categorized petitioner as disabled and unfit to parent. Dr. Blumberg noted that standard testing was not and could not be completed because of petitioner's inability to read well.

CCDSS's and the lower court's reliance on the specific report and testimony of Dr. Blumberg in this case to support their assessment of petitioner's mental capabilities was inappropriate. Dr. Blumberg's testimony was, admittedly, conjectural and speculative. A parent's right to parent should rarely, if ever, be terminated based upon conjectures and speculation. The record even reflects that there was little basis for the conjectures and speculation furnished by Dr. Blumberg. Additionally, Dr. Blumberg also failed to furnish his opinions to any degree of medical probability. We presume he was called to testify as a medical expert as that is his apparent field of expertise.[17]

---

**16.** Dr. Blumberg's report dated October 30, 1997 was admitted into evidence at an Exceptions hearing on June 23, 1998 at which Dr. Blumberg testified.

**17.** Chris Watkins in *Beyond Status: The Americans with Disabilities Act and the Parental Rights of People Labeled Developmentally Disabled or Mentally Retarded*, 83 Cal. L.Rev. 1415, 1443 (1995), writes:

"Other cases interpreting statutes like those in force in Illinois and Louisiana have relied on expert testimony that has more to do with presumptions about group characteristics than actual observation of individual behavior or abilities. This reliance on experts' presumptions lightens the burden on the courts: it requires resources and time to evaluate an individual's parenting abilities, and it is much easier to rely on the opinions of experts who need only two or three hours with the parent to reach their conclusions. These conclusions in turn support presumptions about the inadequacy of developmentally disabled parents.... When courts allow presumptions of inadequacy to replace individual inquiry, they erect insurmountable hurdles for parents labeled developmentally disabled or mentally retarded.

When responding to questions as to why he did not perform tests on petitioner that are sometimes utilized to measure intelligence quotient and adaptability levels, Dr. Blumberg testified: "Well I would *probably* categorize his intellectual impairment as—a disability. I mean, it really does hamper him; he's—he—he cannot read, his judgment is very limited." (Emphasis added.) He also testified: "Usually, I'll give an individual the Minnesota Multi-facet Personality Inventory—MMPI—but, Mr. F. was unable to read, so the test couldn't be administered."

We are informed by the amicus brief that the MMPI is not used to measure mental "retardation." Moreover, the application and use of the MMPI are not limited only to people that can read. The extent to which Dr. Blumberg relies on a person's inability to read in order to find mental "impairment" or "retardation" is troubling, especially when it is used in proceedings to determine whether to terminate parental rights. There remain, regrettably, large portions of our population that are described as illiterate. In the past, major portions of our population have been illiterate. Many newcomers to our country may not be literate in languages understood by experts who do not speak their language. We would also suspect that illiteracy is disproportionately present among the poor. While literacy, when present, is a very positive aspect of parenting, it is not the only, or even the predominant, factor in being a parent. It is only one of many.

Ultimately, Dr. Blumberg proffered:

"Q. [Petitioner] is intellectually impaired enough that he couldn't be a fit parent?

A. I think so.

Q. Okay. Could you be wrong?

A. That certainly is a possibility."

Dr. Blumberg's speculation is of insufficient evidentiary value for all of the reasons stated above. Moreover, a parent should not, normally, be deprived permanently of his or her fundamental parental rights upon a response to such a question of, "I think so."

In contrast, C. Michael Hardesty, an expert in developmental disabilities, who was petitioner's employment supervisor at United Cerebral Palsy, testified on petitioner's behalf. Mr. Hardesty testified to petitioner's strong work ethic, and to petitioner's duties as a house counselor for United Cerebral Palsy. Specifically, Mr. Hardesty stated that petitioner's duties had included providing assistance like toileting, dressing, and feeding to persons with profound disabilities, such as quadriplegia.

Some CCDSS caseworkers [18] overseeing petitioner's file and sitting in on supervised visitations of petitioner and his children testified that petitioner did, in fact, need a high amount of supervision at the visitation sessions to care for the children, and that, in their view, unsupervised visitation would endanger the safety of the children. The caseworkers, however, did recognize that petitioner attempted to bring food, albeit food Edward was not always able to eat, engaged the children in play, and demonstrated an ability to learn and improve his parenting skills through his progress in paying attention to and caring for the children. For instance, petitioner acted appropriately during the visits and sought to teach the children to wash their hands and share. Also, the caseworkers testified that Tristynn called petitioner "Dada" and was happy to see petitioner, and while the visits with Edward were more difficult for petitioner, Edward would at times seek petitioner for comfort. Finally, a social worker observing some of the visits testified that when petitioner needed assistance with the children during the visits he knew to ask for help, and that while, in her view, he was not currently ready for unsupervised visitation, given the opportunity, petitioner could learn the necessary skills. In essence, even CCDSS testified to a certain degree that reunification in the future was reasonably possible, if not probable.

Petitioner is a thirty-eight-year-old African–American male. He graduated from high school in 1982 and has maintained

---

18. We are referring to CCDSS social workers Deborah Ramelmeier and Helga Anderson.

steady employment as a maintenance/cleaning person, a cook, and for six years as a house counselor—all since his graduation from high school. Petitioner has acknowledged his difficulty with reading and he has enrolled, voluntarily and without prompting from CCDSS, in remedial reading classes to improve his reading ability. He has attended parenting classes two times per week for approximately three and a half years and he has attended Parents Anonymous. Petitioner has little history of drug or alcohol abuse, and no history of child abuse or willful neglect. He now lives in a two bedroom townhouse, which includes a bedroom for himself and one which would be shared by the boys were they to be allowed to live with him. He testified that his parents live close to his home and that if he were to encounter problems with the children while in his care, he would know to call his parents or CCDSS for help. Finally, petitioner contends that the short visits under supervised conditions, which is all that CCDSS now permits, render it nearly impossible to establish any regularity with the children, but that with assistance from the appropriate sources he can successfully parent his children.

Since the childrens' placement in foster care, the record reflects that the children are both adjusting well to, and doing well in, their foster homes. Tristynn had several placements during his first sixteen months in foster care. On April 30, 1997, Tristynn was placed with petitioner's aunt and uncle (Mr. and Mrs. F.). He is still under their care. Although showing some developmental delays, Tristynn is described as happy and is comfortable with his foster parents, but shows affection for petitioner and displays no negative reactions after visits. Mr. and Mrs. F. wish to adopt Tristynn, but expect Tristynn to continue his relationship with petitioner.

Edward, upon his release from the hospital at about two weeks old, was placed with Mr. and Mrs. M., licensed foster parents with training to care for special needs children. Despite his medical problems, which require regular monitoring because of a cyst on his brain and food and environmental allergies, he has adjusted well in foster care. Mr. and Mrs. M. want Edward to know his father, but stated that Edward

has had difficulty in visiting with petitioner and seems irritable after visits. Mr. and Mrs. M. wish to adopt Edward at the end of this litigation.

## IV. Discussion

### a. Adoption—Standard of Review

Maryland Code (1984, 1999 Repl.Vol.), section 5–313 of the Family Law Article (FL)[19] mandates that the trial court follow the standard set forth therein when determining whether parental rights are to be terminated. That section reads, in part:

"(a) *In general.*—A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent otherwise required by §§ 5–311 and 5–317 of this subtitle, if the court finds by clear and convincing evidence that it is in the best interest of the child to terminate the natural parent's rights as to the child and that:

. . .

(2) in a prior juvenile proceeding, the child has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child; or

. . .

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall give:

(1) primary consideration to the safety and health of the child; and

(2) consideration to:

(i) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

---

**19.** All references to section 5–313 are to this citation.

(ii) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(iii) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(iv) the child's adjustment to home, school, and community;

(v) the result of the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

1. the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

2. if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

3. the maintenance of regular communication by the natural parent with the custodian of the child; and

4. whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(vi) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

(d) *Considerations following juvenile adjudication.*—(1) In determining whether it is in the best interest of the child

to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court shall consider the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family;

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able;

(iv) 1. the child was born:

A. addicted to or dependent on cocaine, heroin, or a derivative thereof; or

B. with a significant presence of cocaine, heroin, or a derivative thereof in the child's blood as evidenced by toxicology or other appropriate tests; and

2. the natural parent refuses admission into a drug treatment program or failed to fully participate in a drug treatment program; or

(v) the natural parent has:

1. subjected the child to:

A. torture, chronic abuse, or sexual abuse; or

B. chronic and life-threatening neglect;

2. been convicted:

A. in this State of a crime of violence, as defined in Article 27, § 643B of the Code, against the child, the other natural parent of the child, another child of the natural parent, or any person who resides in the household of the natural parent;

B. in any state or in any court of the United States of a crime that would be a crime of violence, as defined in Article 27, § 643B of the Code, if committed in this State against the child, the other natural parent of the child, another child of the natural parent, or any person who resides in the household of the natural parent; or ·

C. of aiding or abetting, conspiring, or soliciting to commit a crime described in item A or item B of this item; or

3. involuntarily lost parental rights of a sibling of the child.

(2) If a natural parent does not provide specified medical treatment for a child because the natural parent is legitimately practicing religious beliefs, that reason alone does not make the natural parent a negligent parent.

(3) The court shall consider the evidence under paragraph (1)(i) through (iv) of this subsection regarding continuing or serious conditions or acts and may waive the child placement agency's obligations under subsection (c) of this section if. the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child.

(4) The court shall waive the child placement agency's obligations under subsection (c) of this section if the court finds that one of the circumstances or acts enumerated in paragraph (1)(v) of this subsection exists.

(5) If the court finds that any of the circumstances or acts enumerated in paragraph (1)(v) of this subsection exists, the court shall make a specific finding, based on facts in the record, as to whether or not the return of the child to the custody of the natural parent poses an unacceptable risk to the future safety of the child." ·

 In cases where the termination of parental rights is involved, there is, as we have said, a strong presumption that the child's best interests are served by maintaining parental rights. It is only when clear and convincing evidence exists

that the child's best interests are served by termination, may a parent's constitutional right to parent his child be permanently foreclosed. In our view, in the instant case, considering the allegations made by CCDSS as to petitioner's mental capacity, the parenting and reunification services offered to petitioner were not sufficient and not sufficiently tailored to his alleged specific situation to support a finding that, with sufficient and properly tailored services, he could not maintain a parental relationship with his children. (Sec.5–313(c)(2)(i)). There was evidence of only one reunification agreement between the natural parent and CCDSS. The agreement that petitioner was required to enter into, was, as we have said, deficient in its specific application to his needs. Even then, the evidence supports that petitioner made a major effort to fulfill his obligations under that agreement, albeit limited somewhat by his then reading level. While there may be no easily ascertainable levels of assistance that must be offered when the termination of parental rights of a "disabled" parent is involved, that level is far above the minimal services CCDSS offered in the case *sub judice.*

Additionally, on his own, petitioner sought help in improving his reading ability and thus his level of literacy. (Sec.5–313(c)(2)(ii)). The children had bonded well with foster parents, but also appeared to display feelings and some bonding with petitioner. (Sec.5–313(c)(2)(iii)).[20] The children, while apparently well adjusted to their foster parents and foster homes, also appeared comfortable with petitioner when he was permitted to be with them. Neither child was in school and there was no evidence as to any community adjustment. (Sec.5–313(c)(2)(iv)).

---

**20.** As in many cases where the children have been forcibly removed from the custody of their natural parents, bonding issues may be severely affected by the extent of that removal. It may become increasingly difficult to maintain bonding because of the circumstances. In essence, the process makes the bonding difficult, then social service agencies rely on the lack of bonding as one of the reasons for termination.

There was uncontradicted evidence that petitioner had made extensive and extraordinary efforts to further reunification with his children. He had, to the best of his ability, attempted to do almost everything asked of him, and more, in order to become a capable parent. Additionally, he currently had steady employment, and had been steadily employed for extended periods of time. He had living facilities that included a bedroom for the children. There is no evidence that the facility, itself, was presently unsuitable. There were relatives nearby that could offer assistance upon request. His employment had consisted of assisting disabled persons in assisted care living situations. (Sec.5–313(c)(2)(v)). In so far as the record reflects, he maintained as regular a contact with his children as CCDSS would permit. (Sec.5–313(c)(2)(v) 1). There is little evidence to which we have been directed in the record that he has declined to contribute to the payment of the expenses of his children, or, for that matter, that he is at the present time unable to contribute to their support. (Sec.5–313(c)(2)(v) 2). The record reflects that petitioner has attempted to maintain regular contact with his children but that, to some degree, he has been stymied in his attempts by the position taken by CCDSS. (Sec.5–313(c)(2)(v) 3). The evidence is unclear as to whether additional services, specific to petitioner's needs, would bring about lasting parental adjustments facilitating reunification. Nevertheless, it is clear that only regular services have been offered under a single reunification program. It is asserted by petitioner, and by his expert witness, and amicus curiae that additional services that are particularly appropriate for someone in petitioner's situation are available, but have never been offered to him. It is thus unclear, and certainly not to a clear and convincing standard, that proper additional services could not bring about an adjustment that would permit reunification in the reasonable future. Until such services are offered, and petitioner avails or does not avail himself of such services, it is not clear that reunification is unforeseeable. (Sec.5–313(c)(2)(v) 4).

Equally, we do not believe that the evidence presented below satisfies the clear and convincing standard as to the

conditions or acts under section 5–313(d). As we indicate elsewhere, there is little evidence, as opposed to conjecture, that petitioner was inherently disabled to such an extent that he would be unable to care for the needs of the children for considerable periods of time. (Sec.5–313(d)(1)(i)). He had, in fact, cared for the needs of other disabled persons as a part of his steady employment. He could not adequately read, but was taking classes to address that deficiency. He was a high school graduate. He had adequate living facilities. There was no scientific evidence that he was mentally impaired—that was an assumption that was made by CCDSS and Dr. Blumberg, who apparently presumed that he was, but undertook no tests to establish the extent, if any, of such impairment. Dr. Blumberg was of the perhaps mistaken opinion that the tests to determine the extent of impairment could not be given to someone who could not read. There was no evidence that petitioner had ever committed acts of abuse or willful neglect in respect to the children. In fact, when he was unable to care for Tristynn for a temporary period he approached CCDSS seeking assistance. (Sec.5–313(d)(1)(ii)). There is no evidence that the petitioner *"repeatedly"* failed to give his children adequate food, shelter, etc. The only evidence in the record is that on the one occasion when he was unable to care for a child, he went to CCDSS seeking assistance. Since that moment, he has not had custody of the children.

One of the children was apparently born with health problems related to the drug addiction of the mother, not the petitioner. There is little evidence that the petitioner had, or has, any alcohol or drug problems. Nonetheless, he attended all drug and alcohol rehabilitation programs to which he was referred, only to have those programs conclude that he had no such problems. (Sec.5–313(d)(1)(iv)(1) and (2). There is no evidence that the petitioner ever subjected either of the children to torture, chronic abuse, or sexual abuse. The only time that there was any evidence of neglect it was not chronic or life-threatening, and, in fact, petitioner sought assistance from CCDSS. One is not neglecting children when he seeks assistance from CCDSS. (Sec.5–313(d)(1)(v)(1). There is no

evidence that the petitioner has ever been convicted of any criminal offense. (Sec.5–313(d)(1)(v)(2). Other than the children at issue in the instant case, there is no evidence that petitioner has ever lost parental rights of the children's siblings. (Sec.5–313(d)(1)(v)(3)

This law clearly establishes that the relevant standard in TPR proceedings is to be by "clear and convincing evidence" and what is in "the best interest of the child." In *In re Mark M.*, 365 Md. 687, 705–06, 782 A.2d 332, 343 (2001), we recently reiterated the importance of the "best interest of the child" standard within the context of the Family Law Article of the Annotated Code of Maryland:

"Pursuant to the doctrine of *parens patriae*, the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. *See Boswell*, 352 Md. at 218–19, 721 A.2d at 669. We have held that 'the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute.' *Boswell*, 352 Md. at 219, 721 A.2d at 669; *see also In re Adoption No. 10941*, 335 Md. at 113, 642 A.2d at 208 (stating that 'the controlling factor ... is ... what best serves the interest of the child'). That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy. . . . As we stated in *In re Adoption/Guardianship No. A91–71A*, 334 Md. 538, 640 A.2d 1085 (1994), the child's welfare is 'a consideration that is of "transcendent importance' ". . . ."

In determining whether it is in the "best interests" of the children, here Tristynn and Edward, to terminate completely a natural parent's relationships with his children, the court (the Circuit Court for Carroll County) was required to consider the factors listed in section 5–313(c) that we have extensively discussed above. We are well aware that the trial court "is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests." *In re Mark M.*, 365 Md. 687, 707, 782 A.2d 332, 343–44 (2001). CCDSS argues in its brief how the Circuit Court in making its determination neither abused its

discretion nor made findings that were clearly erroneous, and that the Court of Special Appeals supported the Circuit Court's findings and found the Circuit Court not to have abused its discretion. The Court of Special Appeals opined:

"The Circuit Court conducted hearings in the instant matter.... The court concluded that it was in the best interests of the children to terminate Mr. F.'s parental rights.

. . .

Based on the evidence, reviewed below, we cannot say that the Circuit Court was clearly erroneous in its factual determinations or that it abused its discretion by terminating Mr. F.'s parental rights."

*In re Adoption/Guardianship Nos. J9610436 and J9711031,* No. 1579, slip op. at 4 (Court of Special Appeals May 11, 2001).

Upon our review of the record in this case, it is evident that there was not clear and convincing evidence in the record of this case sufficient to overcome the presumption that the "best interests" of the children rest in the retention, generally, of petitioner's parental rights, *although at the present time actual custody may not be appropriate.* There was a failure to rebut by a clear and convincing standard the strong presumption that a child's "best interest" is served by retaining legal relationships with his or her natural parents. The trial court erred in finding otherwise and abused its discretion in terminating petitioner's parental rights.

We hold that the trial court, in considering the factors under section 5–313(c) and 5–313(d), reached an erroneous conclusion that those factors had been sufficiently satisfied so as to establish by clear and convincing evidence that the best interests of the children would be better served by now terminating petitioner's fundamental constitutional right to be a parent to his children. We shall reverse the decisions of the intermediate court and the Circuit Court. In this case, when considering section 5–313 alone, and within the context of Title 5 of the Family Law Article as a whole, there was not ample

evidence to properly conclude that Mr. F.'s disability, even if it exists, renders him permanently incapable of caring for his children in an unsupervised setting. Nor is there sufficient evidence that CCDSS has made adequate reunification efforts to improve petitioner's parenting skills. Certainly, there was not clear and convincing evidence to warrant a present termination of his parental rights.

### b. Decisions Below

A majority of the intermediate appellate court upheld the ruling of the Circuit Court for Carroll County that it was in the best interests of the children to not be returned to Mr. F.'s home. In so doing, the Court of Special Appeals cited in its discussion a body of out of state case law addressing termination of parental rights cases with facts analogous to the facts in the case *sub judice*. There is case law elsewhere where parents, who were eager to keep and care for their children and participate in treatment plans, were stripped of parental rights because of one or both parent's mental retardation, mild mental retardation, mental limitations, or mental deficiencies—despite the parent's lack of wrongdoing and presumed love. Relying on these cases,[21] the Court of Special Appeals's majority rejected Mr. F.'s principal contention that he has not been given a sufficient opportunity to demonstrate that he is capable of reunification in the future and that it would be in the best interests of the children to continue efforts at improving his parenting skills with the goal of reunification.

Additionally, the Circuit Court stated at one point: "Furthermore, the Court finds that Tristynn and Edward have continuously been out of the custody of Mr. F. and in the custody of CCDSS for more than one year." In cases such as this, parents who undeniably love their children, as does Mr.

---

21. *In re R.M.S.*, 187 Ill.App.3d 41, 134 Ill.Dec. 816, 542 N.E.2d 1323 (1989); *In re Terry*, 240 Mich.App. 14, 610 N.W.2d 563 (2000); *In re D.L.S.*, 230 Neb. 435, 432 N.W.2d 31 (1988); *In re Joyce T.*, 65 N.Y.2d 39, 489 N.Y.S.2d 705, 478 N.E.2d 1306 (1985); *In re Montgomery*, 311 N.C. 101, 316 S.E.2d 246 (1984).

F., and seek assistance when assistance is needed, are placed at great risk of losing their children altogether. If they go to the Department of Social Services for help and if the Department places their children, even on a temporary basis, with foster parents with whom they bond (and that is the type of foster parents one hopes are found), the natural parent runs the very real risk of later having that bonding in the foster home, created, in part, by CCDSS and court forced inaccessibility to his own children, be a major factor used by the same court to later terminate his parental rights. In other words, if one seeks help, the removal of one's children may be forced upon him or her, setting in progress an ongoing situation that, day by day, week by week, year by year, through the passage of time, lessens the parent's bonds with the children and, through that de-bonding process, lessens chances of reunification. In such a process, a process that appears to inherently exist, parents risk the thing most dear to them when they seek assistance from the Department.

The trial court also erroneously found that Mr. F.'s mental limitations constituted a disability[22] that as section 5–313(d)(i) states, "renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time." There was not sufficient evidence, meeting the clear and convincing standard, to support the trial court's determination that the complete termination of petitioner's parental rights was appropriate based upon a mental disability. The termination of fundamental and constitutional parental rights is a "drastic" measure, and should only be taken with great caution, after extensive consideration of each of the relevant statutory considerations set forth in section 5–313. Our holding today reflects the idea that fundamental constitutional rights, *i.e.*, the child rearing rights at issue here, can only be completely terminated upon the clearest and most convincing evidence

---

**22.** We have been unable to find in the record sufficient evidence (other than conjecture and speculation) that petitioner was "mentally disabled" as that term is scientifically measured.

that the parent, however poor, uneducated, or disabled, cannot and will not, even with proper assistance, be able to sufficiently parent his children in the reasonable future.

In termination cases, the "best interests" analysis should not be automatically interpreted to be a search for a perfect, or more perfect, or even a better situation for any particular child. Life is not perfect. Children are born into different circumstances—some into wealth and other advantage, some not.

Under the facts of the case *sub judice,* petitioner's parental rights should not have been terminated. Specifically, considering the insufficiency of clear and convincing evidence that petitioner was mentally disabled, CCDSS's non-conformance with its duties under section 5–313 to offer more fully tailored services to a parent it deemed mentally disabled, and the inherent pressure on a social service agency to seek adoption as a permanent situation when the agency's receipt of federal funds discourages extensive reunification efforts and encourages adoption, when compared with all the efforts petitioner has made to be a better parent, and with what petitioner can offer to the child—a termination of parental rights is presently unjustified and improperly strips Mr. F. of constitutionally guaranteed rights. There were significant failures in this case by CCDSS under section 5–313 with regard to petitioner, and such failures ultimately undermined the best interests of Tristynn and Edward, which is still presumed to be reunification with a natural parent desirous of reunification.

Primarily, CCDSS failed petitioner, and did not adequately perform its statutorily mandated duties under section 5–313(c)(2), by failing to provide a timely and sufficiently extensive array of available programs for petitioner, who, while perhaps hampered by some cognitive limitations, is eager and may well be able, with properly tailored services, to care for his children. From the moment petitioner came to ask for help, CCDSS, as far as we can discern, provided only untailored reunification services. CCDSS should have, instead of providing services for which there was little or no need,

provided more specific services for petitioner who consistently displayed a willingness and genuine desire to care for his children. CCDSS had at its disposition better suited services for petitioner.[23]

*As was stated many times by the range of witnesses both for and against petitioner, no one ever posited the possibility that petitioner regain immediate unsupervised control of his children if CCDSS's petition for guardianship and adoption were to be denied. We are, thus, not concerned in this case with the immediate complete reunification and custody of the children with the petitioner. We merely hold that on the evidence in this record, termination was not warranted.*

Moreover, CCDSS's main contentions of petitioner's perceived inabilities to parent Tristynn and Edward in the immediate future do not lead to the conclusion that petitioner "has a disability that renders [him] consistently unable to care for the immediate and ongoing . . . needs of the child for long periods of time" under section 5–313(d)(1)(i).

Petitioner is, according to the record before us, able, even with his "cognitive limitations" (if they exist), to now financially provide for Tristynn and Edward's care and maintenance. Since high school, petitioner has consistently been employed. Petitioner has demonstrated a relatively dedicated work ethic. He has a better work history than many fathers who are not alleged to be mentally impaired. Petitioner has also demonstrated this work ethic while dealing and caring successfully for those at the United Cerebral Palsy Center with severe disabilities. This ability to care for those with severe disabilities might be an indication that petitioner's immediate parenting problems, if they exist, would dissipate within the near

---

**23.** While we did not research the services available to CCDSS to present to its clients, we note the services brought to light by those groups comprising and writing the amicus brief in this case. The amici note numerous services available to assist parents with developmental disabilities. CCDSS agents are in the best position to be aware of and offer specific Carroll County services, but, in circumstances such as those allegedly extant here, they should also present or find other state based agencies to help allegedly cognitively limited parents.

time, with the aging of the children, and petitioner's continued growth in his parenting skills.

The judgment of the Court of Special Appeals is reversed, and the case shall be remanded to that court for it to reverse the judgment of the Circuit Court for Carroll County.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY TERMINATING PETITIONER'S PARENTAL RIGHTS; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.[24]**

---

24. The dissents misconstrue the primary issue before the Court. This is not a case involving the parent's right to the immediate custody of the children. The Court does not dispute the lower court's holding, as stated in the dissent "[T]hat Mr. F. was not a fit custodial parent at the time of the hearings." This is, instead, a case involving the right of the State, through its agencies, to forever terminate the rights of parents to be parents, when those parents have engaged in no willful conduct that would justify the taking away of important and fundamental constitutional rights. We noted above "although at the present time actual custody may not be appropriate," and "[a]s was stated many times by the range of witnesses both for and against petitioner, no one ever posited the possibility that petitioner regain immediate unsupervised control of his children.... We merely hold that on the evidence in this record, termination was not warranted." Our holding is that in view of the fact that the parent in this case was not abusive and did not willfully neglect the only child that has been in his custody and, in light of the basic and fundamental and important constitutional rights involved, termination, on the record now extant in this case, was not presently warranted. We have abundantly made clear that we are not addressing the issue of present custody.

Judge Harrell's dissent criticizes the Court, stating: "I fault the Majority of this Court, however, for listening to the music, but not the words." What we have done is to consider the status of the parent's intentions and efforts, and determined that nothing in this case warrants the present termination of his parental rights. What the dissenters fail to acknowledge is that the majority holds that the evidence, however the dissent characterizes our consideration, be it words or music, does not support the abolishment of this innocent parent's constitutional rights.

The dissenters, while accusing the majority of ignoring "much of what our job is about," fail, utterly, to recognize that any court's primary obligation is to the Constitutions. It is what we, as judges, take an oath to uphold. What we have said is not that the parent at

Dissenting Opinion by WILNER, J. in which RAKER and HARRELL, JJ., join.

I have joined Judge Harrell's dissent. I write separately because I am concerned not just about the decision that the Court reaches but also about the tenor of the majority Opinion. This case does *not* involve discrimination against disabled parents or poor parents. It does *not* involve any trampling upon the legitimate parental rights of Mr. F. It does *not* involve any fuzzy-headed social engineering designed simply to move children into a more affluent environment. It does *not* involve any legislative or executive transgression on basic Constitutional rights. It is simply a case in which (1) nearly six years ago, two children were found to be in need of assistance by the juvenile court, (2) no appeal from or attack on those decisions has ever been made, (3) efforts were made to reunify the children with their father, but (4) the conclusion was drawn, based on evidence that the trial court found persuasive, that Mr. F. was not in a position, and was not likely to be in a position in the foreseeable future, to be able to care properly for the children, who have special needs, and (5) there *are* prospective adoptive parents willing and able to care for the children on a permanent basis. Everyone seemed to agree that if an adoption proceeds, it should be an open one, in which Mr. F. may maintain contact with the children.

Although parents do have a Constitutional right to raise their children, if they are able to do so, the law allows a court to terminate parental rights, under specified circumstances, when the welfare of the children would best be served by that course of action. In order to justify such a decision, the court must make a series of findings on issues stated in the statute, and the court did so in this case. These are often very difficult and heart-rending cases, tears flowing on all sides, but it is the safety and welfare of the children that must govern.

present has the right to custody of his child, but that, on this record, it is too soon to sever all relationships with this non-abusive, non-neglectful parent, for all time, with his children, in order to find "better parents," and to violate his constitutional rights by doing so. The bottom line is that parents have rights.

It is for the trial judge, not for us, to weigh and consider the evidence, and the mere fact that we might have judged the evidence differently than the trial judge or have arrived at a different conclusion altogether does not warrant reversing the judgment. These are simple and well-established principles of both substantive and procedural law that, in my view, have gotten lost in the Court's opinion. The Court has thrown appellate restraint to the wind, and, in doing so, has not only subordinated the welfare of these two children to its incorrect view of how far the parent's rights extend but has also injected considerable uncertainty into termination proceedings generally.

Judges RAKER and HARRELL have authorized me to state that they join in this dissent.

Dissenting Opinion by HARRELL, J. in which RAKER and WILNER, JJ., join.

I respectfully dissent. Some time ago it was observed that "hard cases make bad law." [1] This is such a case. Giving proof to that aphorism, the Majority opinion in this case engages in appellate fact-finding in an effort to justify its desired result, heedless of the need for disciplined appellate review of the record in this extraordinarily difficult termination of parental rights case.

Mr. F is a compelling petitioner. No party, no attorney, no witness, and least of all not the trial judge, expressed any doubt that Mr. F is other than "a hard-working, sincere man who loves his children and seeks to promote their well-being." [2] This same cast of characters essentially agrees, however, that Mr. F is intellectually impaired. Although the extent of his impairment was not quantified neatly in a numerical expression, I think it must be conceded on this

---

1. John Campbell, Lord Chief Justice, in *Ex parte Long*, 3 W.R. 19 (1854), wrote "Hard cases, it is said, make bad law."

2. .Trial judge's Memorandum And Order, Page 10, dated 23 August 2000.

record (Mr. F's own opinion notwithstanding), that it was proven, and the trial judge so found, that Mr. F was not a fit custodial parent at the time of the hearings below. The evidence supporting that conclusion was more than anecdotal or speculative, as dismissed by the Majority opinion. The real dispute was whether his impairment was of such a degree that, in order to maximize his potential to become a fit parent to Tristynn and Eddie (and giving due regard to Eddie's extraordinary medical needs) in the foreseeable future, Mr. F required only "drop-in" external support [3] or virtually full-time support. Mr. F's witnesses expressed confidence that he could become, within 6–12 months, a fit custodial parent with only drop-in types of services. The trial judge did not credit that testimony, however, and, on the evidence that was before him, concluded instead that there was little likelihood that Mr. F's shortcomings as a custodial parent would be remedied in the near future. The trial judge terminated Mr. F's parental rights, as opposed to continuing the children in foster care limbo, in the face of the unlikelihood of reunification in the foreseeable future and the presence of two sets of ready, willing, and able adoptive "parents."

The Majority opinion's analysis, as invited to do so by Petitioner and Amicus, fixates on two essentially evidentiary issues: (1) the quality of, and weight to be given, Dr. Blumberg's opinion as to Mr. F's parental fitness; and (2) asserted shortcomings in the services offered by the Carroll County Department of Social Services (DSS) to Mr. F to facilitate reunion of the children with him. The Majority glosses-over the evidence as to Mr. F's condition and how it would affect his ability to rear his children if they were returned to his care and custody, now or in the foreseeable future. To the extent the trial judge considered and gave weight to Dr. Blumberg's opinion (occupying but a paragraph of the judge's 12 page Memorandum and Order of 23 August 2000), it was as to the

---

3. The estimates by some of Mr. F's witnesses of the temporal intensity of such needed services ranged from 6 to 15 hours per week.

required factor of FL § 5–313(d)(1)(i) [4] ("whether ... the following continuing or serious condition[ ] ... exist[s]: (i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child[ren] for long periods of time"), and confined to "mental retardation" as further defined in § 7–101(*l* ) of the Md.Code (2000 Repl.Vol.), Health–Gen. Art. ("a developmental disability that is evidenced by significantly subaverage intellectual functioning and impairment in the adaptive behavior of an individual."). The judge's conclusion that Mr. F suffered from such a disability, however, was not dependent on Dr. Blumberg's opinion alone. The judge noted that he considered the other witnesses called by DSS, as well as those called by Mr. F, each of whom also acknowledged, in various ways, Mr. F's intellectual limitations.

The issue in this case is not whether Mr. F was and is disabled. More precisely, it was how much support it would take to determine if that disability could be mitigated to the degree that a fact-finder could conclude that there was a reasonable probability that Mr. F, in the foreseeable future, could become a fit parent for two small children, one of whom has extraordinary medical needs. Mr. F claims it was DSS's job to supply, or direct him to, services tailored to overcome his disability, to the degree possible, insofar as it made him less than a fit parent. DSS asserts it had no such obligation or, alternatively, that it would take around-the-clock supervision of Mr. F and the children and other assistance which it does not (nor can) offer and, on this record, no other governmental agency or organization has been shown adequately to be able to offer to Mr. F in these circumstances, i.e., a *specific* mentally-disabled, single parent seeking to raise and care for *these* two small children.[5] An examination of the record

---

4. As does the Majority opinion (*see* op. at 689, n. 19), all references in the dissent to § 5–313 are to Maryland Code (1984, 1999 Repl.Vol.), § 5–313 of the Family Law Article (FL).

5. Amicus and Petitioner's appellate counsel's efforts to supplement the trial court record notwithstanding, the trial judge was not presented

before the trial judge reveals that his fact-finding was not clearly erroneous and his conclusions were supported, to a clear and convincing standard, by the facts in evidence.

Dr. Blumberg performed a forensic psychiatric evaluation of Mr. F in October 1997 in order to determine his parental fitness.[6] In preparation to meet with Mr. F, Dr. Blumberg reviewed the extensive written case file provided by DSS. His clinical examination of Mr. F took place at meetings of two hours duration on 15 October 1997 and one hour on 21 October 1997.[7]

Dr. Blumberg concluded that Mr. F, "although well-meaning and well-intentioned, has significant intellectual limitations, and it's those limitations that, I think, seriously handicap[ ] his ability to take care of children . . . especially so with his youngest child having a number of medical problems and complications." Mr. F, according to Dr. Blumberg, was "in complete denial of any difficulties, and, apparently, [even with]

---

adequately with either the specificity, number, or relative certitude of sources for outside assistance as now urged are available.

6. The only objection noted by Mr. F's trial counsel to the testimony of Dr. Blumberg, who was accepted without objection as an expert in psychiatry, was one lodged technically and without argument or support. In context, it could be argued from the context of the point in the proceedings when the objection was raised that it amounted to a challenge to Dr. Blumberg's training and experience to express such an opinion; however, if that were the case, the record demonstrates the objection to be baseless. As to his specific experience and training, Dr. Blumberg testified that he had performed six parental fitness evaluations for the Supreme Bench for Baltimore City (now the Circuit Court for Baltimore City) during his forensic fellowship at the University of Maryland Medical School and an additional 20–30 such evaluations in the course of his subsequent private practice, mostly in cases in the Circuit Courts for Carroll and Harford counties.

7. Dr. Blumberg stated he could not administer the usual Minnesota Multi–Facet Personality Inventory (MMFI) to Mr. F because Mr. F was unable to read well enough. Mr. F's trial counsel, unlike his appellate counsel and Amicus, mounted no contention that the MMFI could have been administered nonetheless. In any event, the lack of an MMFI test result has not been argued, in and of itself, to invalidate Dr. Blumberg's opinions.

supervised visits [with the children] needed considerable assistance."

Dr. Blumberg equated Mr. F's intellectual impairment with a disability that compromised his parenting ability. As examples of how this disability would manifest itself, the witness explained that, because Mr. F's judgment range was "very limited," he likely would: (a) fail to anticipate or recognize the signs of impending medical problems; and, (b) be unable to set limits for the children, help with school work, or address their emotional problems as they grew older. It was not, for Dr. Blumberg, a question of Mr. F being abusive or deliberately harmful, but that he would be unintentionally neglectful or unable to respond appropriately to the children's needs because he did not appreciate what those needs were or might be. Mr. F's response to Dr. Blumberg presenting such issues to him during the examination was essentially that all the children needed was love and that would be enough.

Factored into his opinion, Dr. Blumberg acknowledged that Mr. F probably could improve his reading skills to achieve a very basic, primary level of comprehension, but that it would be difficult for him ever to learn to read, for example, a newspaper. Although he believed Mr. F could learn some additional, fundamental parenting skills, Dr. Blumberg did not think he would be able to learn the number of skills necessary to parent properly these two children, one of whom has special needs himself.

After receiving Dr. Blumberg's written report into evidence,[8] the trial judge asked Dr. Blumberg if he saw any probability that there would be an improvement in Mr. F's ability to be a fit parent for these children in the future. Dr. Blumberg responded in the negative, explaining that Mr. F's intellectual impairment was a permanent condition with which he was born and would continue throughout his life.

---

8. Mr. F's trial counsel noted that its receipt was "only subject to my prior objection," which, as we noted *infra* at n. 6, was largely unarticulated.

Deborah Ramelmeier, a former employee of the DSS who had been the caseworker assigned to Mr. F's children's cases from their inception until November 1997, testified about the children's physical conditions. Both children were developmentally delayed.[9] Eddie had a brain cyst which, together with related fluid build-up, required daily monitoring to identify and ward-off serious health implications. Eddie also suffered from persistent pulmonary hypertension and serious reactions to environmental allergies.[10]

Ms. Ramelmeier next explained the general course of DSS's efforts to work with Mr. F. Although one service agreement was executed, on 3 July 1996,[11] Mr. F rejected two subsequent proposed agreements, one offered on 13 December 1996 and another on 23 April 1997.[12] It is unclear whether Mr. F

---

**9.** Through the efforts of their respective foster parents, the children's developmental delays were overcome or under control by the time of the hearings below.

**10.** Another DSS caseworker witness, Dana Pflugrad, testified to Eddie's last affliction.

**11.** The one service agreement entered into with Mr. F included that he undergo a drug and alcohol evaluation. According to Ms. Ramelmeier, he told the evaluator that he never drank alcohol and did not use drugs. Accordingly, the evaluator rated Mr. F a non-user and no further action was thought necessary by the evaluator. Indeed, when Mr. F testified below, he asserted he drank only one time in his life and that was two beers on his previous birthday, 25 April 1999.

Ms. Ramelmeier, however, testified that, upon learning of Mr. F's alcohol evaluation result, she questioned Mr. F because he had acknowledged to her in an earlier meeting that alcohol played a larger part in his life than he had stated in the evaluation. She asked that he submit to another evaluation, which he initially stated that he would do, but never followed-up on having another evaluation.

**12.** Of passing interest because Mr. F complains vehemently of the lack of services offered him by DSS, I note that, in his trial counsel's closing argument before the trial judge at the end of the exceptions hearing on 23 June 1998 regarding the Master's recommendation as to visitation, counsel stated "[s]ince [turning the children over to DSS], he's [Mr. F] gotten a lot of services." Ms. Ramelmeier confirmed this in her testimony at that hearing as she did not "recall that [Mr. F] asked for any other services." When one considers that Mr. F apparently was represented by counsel (not the same one as represents him on appeal) at least as of the time he rejected the April 1997 proposed services

rejected the proposed agreements on his own volition or on the advice of counsel. It was after the last proposed agreement was rejected by Mr. F on 6 May 1997 that DSS notified him on 13 May 1997 that it was changing its plans for the children from attempts at reunification with Mr. F to a permanency plan of termination of his parental rights and possible adoption. She summarized the Department's thinking regarding the change in the permanency plan:

> The struggle that we've been dealing with is that, although Mr. F desperately wants to care for his children and he loves his children, *we feel very strongly that he doesn't have the ability, regardless of what services we could provide for him. We are never going to be able to provide services enough to make him able to care for his children.* (emphasis added).

Although cataloguing some logistical and veracity problems with Mr. F during the time she worked with him (such as missing appointments to visit the children due to his erratic work schedule, forgetting to call and re-schedule, not telling her the truth about whether and how he had electricity at his dwelling, and other matters relative to his status), Ms. Ramelmeier noted that the main and continuing problem over the eighteen months she worked with Mr. F and observed his numerous supervised visitations with his children was the high degree of supervision he needed in order to identify and remember the most fundamental parenting skills, such as feeding, changing diapers, playing with the children, and teaching them to talk. Although Mr. F improved his parenting skills somewhat over this period of time, he nonetheless required constant reminders and supervision, lest a child be choked by inattentive feeding, overwhelmed by the number of toys offered, or failing to receive proper teaching (exemplified by Mr. F's desire to teach the alphabet to a 10 month old, before teaching him how even to utter intelligible sounds).

---

agreement, a failure to complain then about the services offered makes the related arguments mounted during the trial and appellate stages of this matter appear somewhat less genuine.

Ms. Ramelmeier also noted that Mr. F had unrealistic notions of what activities were appropriate for children of such tender ages, such as his desire, expressed shortly after Eddie was born, to take both children to Hershey Park and to go swimming at a public pool.

The caseworker who replaced Ms. Ramelmeier, Ms. Helga Anderson, testified next. She supervised the children's cases until March 1998. She narrated a series of examples, gleaned from her interactions with Mr. F and monitoring of his visitations with the boys, how Mr. F continued to have difficulties dividing his time appropriately between the two children, his inappropriate notions of field trips he proposed to take the children on (such as an Orioles night game), and other problems. Of potential greatest consequence, and representative of Mr. F's lack of reading skills combined with an unrealistic, simplistic approach to looking out for the best interests of the children, Ms. Anderson recounted how Mr. F brought a gift in May 1998 to Eddie, age two at the time, that bore a warning on the box that, due to a potential choking hazard, it was inappropriate for children under the age of three. When asked whether he had checked the box to see if the toy was appropriate for children under three, Mr. F responded he had checked the box and that it was an appropriate toy for Eddie.

Asked certain ultimate questions, Ms. Anderson responded thusly:

Q. Based on your observation, would Mr. F be able to have unsupervised visitation with the boys at this time?

A. I really don't believe so. I have concern for the safety of the children. If he's unable to determine when a toy is inappropriate because of choking hazard, he—I—I have concerns if he would be able to give medication appropriately, if he would recognize warning signs if the boys become ill. And, again, he—he does not seem willing to turn to the Agency for help, and I would have concerns as to whether or not the boys would get adequate supervision.

Q. *Are there any other services that the Department could provide to Mr. F at this time?*

A. *Not to my knowledge.*

Q. Since you've been involved in the case, has Mr. F made efforts to adjust his circumstances?

A. I think Mr. F has tried very hard. It's very obvious that he loves his children, that he would like to have his children with him, that he would like to have a chance to be a father to his children. I think he has done everything within his capability. I don't believe, unfortunately, that that's enough to provide for the safety of the children.

(Emphasis added).

The Court interjected itself in the questioning of Ms. Anderson to inquire about special requirements for Eddie and his ongoing medical care needs:

THE COURT: We've—let me interrupt for a second. From the testimony of Mrs. Miller [Eddie's foster mother], I get the impression that Eddie has a lot more problems than Tristynn does.

THE WITNESS: That's correct.

THE COURT: Okay.

THE WITNESS: Tristynn does still have some developmental delays, ...

THE COURT: I understand that.

THE WITNESS: ... but not enough to warrant services from the Infant and Toddler Program.

THE COURT: Right. So, Eddie, because of his past medical problems and probably future medical problems, really needs some—someone caring for him who is going to devote practically full-time to him. I mean, that's the impression that I get from Mrs. Miller.

THE WITNESS: I—I think that he has—because of his sensitive skin, he had gastro reflux ...

THE COURT: Right.

THE WITNESS: ... when he was younger, still has some problems with vomiting. I do believe he needs someone who's very sensitive to the warning signs ...

THE COURT: Right.

THE WITNESS: ... as to when to get him medical attention.

*THE COURT: From your contacts with his father, Mr. F, do you feel that, at the present or anytime in the future, that Mr. F could provide that level of special care that Eddie needs?*

THE WITNESS: I do not.

(Emphasis added).

Resuming her re-direct examination, DSS's trial counsel completed her interrogation of Ms. Anderson by establishing:

Q. As a follow-up, do you believe that Mr. F will possess adequate parenting skills to parent Tristynn?

A. I—I don't believe so. I—I think the issue of being able to give medication and recognize warning signs and appropriate toys and appropriate food by knowing the expiration dates is important, no matter what the age of the child.

Q. Is Mr. F financially able to care for the boys' needs?

A. He has not—although he has a Child Support Order, he has not been paying regularly. He made a payment on February 10th of '98 and then did not make another payment until June 5th of 1998, so he has not regularly been paying child support, which would, from my point of view, call into question his financial ability.

Dana Pflugrad, the current DSS caseworker responsible for Tristynn and Eddie, testified next. She, citing specific examples, reinforced the point that Mr. F, even with the improved parenting skills he had attained, continued to have difficulties keeping up with the changing and evolving needs of his sons, who were ages four and three at that time. As one example, Mr. F, given an opportunity to teach Tristynn that certain conduct he was engaging in should be discontinued promptly or he would be placed in a "time-out" chair, simply started counting out loud, without telling Tristynn how long he was going to count or what the consequences would be if the conduct did not cease before the counting, at whatever number, stopped.

In response to cross-examination by Mr. F"s trial counsel as to why DSS had not offered Mr. F specialized services in view of his intellectual impairment and failed to inquire where such services could be found outside of those offered by DSS, Ms. Pflugrad explained "because it's my belief that Mr. F would need twenty-four hour/one-on-one help with the children if they were placed in his home, and I don't believe that that service exists. There may be some places that would offer some limited services, but I'm not aware of them."

Mr. F testified on his own behalf. Rather than attempt to characterize his testimony, I set it forth verbatim, at least in pertinent part, and note occasionally by footnote in what respects it was contradicted by other witnesses (including those who testified in support of Mr. F):

THE WITNESS: Yes, my name is Edward F....

## DIRECT EXAMINATION

Q. All right. How old are you?

A. I'm thirty-seven.

Q. Since you mentioned work, let's—let's talk about work. How long have you worked at Western Maryland College?

A. I work at Western Maryland college for about five— five years.

Q. Okay.

A. I started in '90—I mean, '94.

Q. All right. What do you do up there?

A. Well, I cook, I clean, and I work on the beverage line mostly.

Q. Okay. So, you work in the kitchen?

A. Yeah, I work inside the kitchen.

Q. All right. What do you make an hour?

A. I make six-fifty.

\* \* \* \* \* \*

Q. Okay. Now, let's go back to your—your first real job. Do you remember when that was?

A. Well, I were go to like education center.

Q. The education center?

A. Yeah.

Q. What's that?

A. The education center—that's a place for like a handicap and for like disabled kids.

Q. Okay. How long did you work there?

A. Well, I've been working there—I was like in school and plus I was working there like all through school and till I got out of school, I've been—they hired me on like on full-time.

Q. Okay. What did you do there?

A. Well, I take the clients in—inside the gym and show them puzzles, and stuff, and take them to the bathroom a lot and I potty train them.

Q. How old were these people?

[interruption of approximately 12 minutes while Court handles another matter.]

Q. Okay. Now, I take you back to your first job. Where was that?

A. At United Cerebral Palsy.

Q. Was—was that your first . . .

A. I'm not—over to the center.

Q. Okay. Okay. Now, you were a counselor there?

A. Uh-huh.

Q. Okay. What age group were the people that you worked with?

A. One all the ways up to—it's about thirty.

Q. Okay. What kind of disabilities do those people have?

A. They have like a Down's syndrome and a—a—United Cerebral Palsy and—and that's it.

Q. Okay. What did you do for United Cerebral Palsy?

A. I was a house counselor.

\* \* \* \* \* \*

Q. Okay. And, as a house counselor, what did you do?

A. Well, I feed the clients and take them over to the mall, push them around inside in a wheelchair and ...

Q. How—how did you get them to the mall?

A. Inside a van.

Q. You drove the van?

A. Yeah, uh-huh.

Q. Do you have a driver's license?

A. Yeah.

Q. Okay. What else did you do with them?

A. Plus, I feed them and they couldn't even move their arms and their legs and showered them and cook, clean, give them their medicine.

Q. You don't read too well, do you?

A. No, I don't. I read ...

Q. Go ahead.

A. .... I read kids book.[13]

Q. Are you taking reading classes now?

A. Yeah. Uh-huh.

Q. So, how do you know what medication to give them?

A. Well, see I got one client named Chuck Parks, you know, and look there for first initials, C for Chuck.

Q. Well, how did you know how much of the medication to give and when to give it to him?

A. Well, on the—I mean, like, on the bottle they have like a time and a date and all that. If I have any problem, I call up to—down to the office.

Q. Okay. All right. So, did you ever have any problems giving the wrong medication?

A. No, I haven't.[14]

---

**13.** There was doubt that this assessment was entirely accurate. Ms. Ramelmeier testified previously that on one occasion she gave ,Mr. F a Dr. Seuss book, "Are You My Mother," to read to Eddie, but Mr. F was unable to do so.

**14.** Charles M. Hardesty, the person who hired Mr. F to work at United Cerebral Palsy and who testified in support of Mr. F, indicated that Mr.

Q. How many years did you work there?

A. About—about five-and-a-half years.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Okay. All right. So, were some of the people that you worked with at United Cerebral Palsy children or were they all adults?

A. There was like adult.

Q. And, at the center, there was some children?

A. Children, yeah.[15]

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Okay. Now, tell—tell the Judge what you're doing, as far as your reading?

A. Well—well, I've been going to classes and . . .

Q. What have you been doing to help yourself learn?

A. Help myself?

Q. Uh-huh. What have you been reading?

A. I've been reading like a kids book and sometime I was like go to a library and I went down last week at like hooked on phonic . . .

Q. Hooked on Phonics.

A. Yeah.

Q. Does that help you?

A. Yeah, helped me pretty good.

Q. So, you know your letters?

A. Yeah, I know my letters.

Q. You know the sounds?

A. Yeah. I mean, my main problem like get down to the sound of the work (unintelligible) like to—like together.

---

F "wouldn't have been responsible for [administering medication]" to the clients. A house manager would have done that.

**15.** Mr. Hardesty indicated that United Cerebral Palsy ran "homes for *adults* that have quadriplegic and other very serious physical disabilities." (emphasis added).

Q. Okay. All right. Let's talk about where you live. Is that a house or is it an apartment, a town house, or what?

A. It's a town house.

Q. How many bedrooms?

A. Two bedrooms.

Q. Does anyone live there with you?

A. Just me by myself.

\* \* \* \* \* \*

Q. Do you have a telephone there?

A. No. Uh-uh. I can't afford it.

\* \* \* \* \* \*

Q. Okay. All right. Now, when this case first started, started by you turning the children into the Department. Is that correct?

A. Yeah.[16]

Q. Why—why did you do that?

A. Well, you see, the mother, you know, she like very much into drinking, drugging and I didn't have no electricity and—and I didn't have no food in there and I—I took them down to the Department of Social Service and I thought I was going to get my kids back once I got my electricity turned back on.

Q. It didn't happen, though, did it?

A. It didn't even happen. I had to go through all of this program and stuff and ...

Q. What programs have you done?

A. I've done a parenting class and a parent—parenting (unintelligible) and I go to parenting class about two time in the week, tryin'—tryin' to learn how to be a better father towards my kids.

Q. Okay. How long did you go to parenting classes?

---

16. As noted in the Majority opinion (slip op. at 11), Tristynn was brought by Mr. F to DSS on 28 December 1995. Eddie had not yet been born at that time. When Eddie was born on 30 May 1996, he went directly from the hospital into foster care, through DSS.

A. For about a—about three-and-a-half years.

Q. And, did you go to Parents Anonymous, also?

A. Yeah.

Q. What's that like?

A. Parents Anonymous—that where you come in, you know, talking about relationships to your kids, you know, and when they're kids, I mean, how you control your kids and when the kids being bad, they tell you how—in what way how you—how you handle your kids.

Q. If you were to have the children, who would you call if you had any questions about what to do with them?

A. Well, first of all, you know, I would call like—like my parents and if I had any problem, I would call like Department of Social Service if I had any problem.[17]

\* \* \* \* \* \*

Q. Now, you haven't missed any visits with the . . .

A. No, I haven't . . .

Q . . . .—with the children.

A . . . . 'cause since this—since my kid been into a custody, I never miss any visit at all, never.[18]

\* \* \* \* \* \*

Q. Okay. so, do you think there's been any problems with the visits?

A. No, I never.

Q. Okay. Do you discipline the children?

A. Yeah. Yes, I have.

---

17. Mr. F's feelings towards DSS appear to wax and wane. As his appellate counsel emphasizes, and to a certain degree Mr. F later portrays in his testimony, he was suspicious and distrustful of DSS (and with cause, it is argued). Yet, at this juncture in his testimony, he professed a willingness to call upon DSS if he "had any problem" which impliedly his parents could not address. The trial judge, however, was not obligated to believe that Mr. F viewed DSS as a resource.

18. DSS records and its witnesses refute this categorical claim. Nonetheless, DSS conceded that, after a while, Mr. F's visits became regular and frequent.

Q. How do you discipline them?

A. Well, you see, my oldest one is Tristynn. He kinda hyper, he wanna play and sometime he holler and make noise and sometime he like throw stuff and I'm trying to not to keep them from throwing stuff and I tell him like about three time not to throw stuff and he keep on going it, you know. I tell him, you know, I'm gonna sit you inside at the time-out room. I mean, that's like—like chair corner and . . .[19]

Q. How long do you put them in time out?

A. Well, two years old like—like about two minutes and three years old like about three minutes.

Q. So, . . .

A. I go by a certain age.

Q . . . . where—where did you learn that?

A. Well, I learned that like a—number one, I like go to the center like go to school and they bring [unintelligible] like a parenting class.

\* \* \* \* \* \*

Q. All right. Do you think you have the ability to raise the children?

A. Yeah. Yes, I do.

\* \* \* \* \* \*

Q . . . .—so, you work full-time, right?

A. Yeah, I work full-time.

Q. Well, who would watch the—the children when you're at work?

A. My mom or my sister, Pat; she ain't workin'.

THE COURT: How old is your mother?

THE WITNESS: My mom, she about seventy. My sister, Pat, and she's like—she's watching my niece right

---

**19.** As Ms. Anderson's testimony revealed, it was questionable whether Mr. F, although apparently aware of this particular educational and disciplinary technique, was able consistently to apply it effectively to its intended ends.

now and I asked her could she watch my two kids? And, she say yeah.

BY [Mr. F''s trial counsel]:

Q. You've already had a discussion with her?

A. Uh-huh.

Q. Has the Department of Social Services ever talked to you about what help might be out there for you in case you got the children?

A. No, they haven't.

Q. Have they told you about ARC program or given you any numbers to call or anything?

A. No, uh-huh. You see, someway, again, I've got to find out like on my own or like—or like ask around, you know, or go over there where I work at like in the (unintelligible) or get like a little bit of advice. I mean, they never bring that up towards me.

 * * * * * *

### [CROSS–EXAMINATION]

Q. Okay. And, you had talked to Ms. Pflugrad about having a birthday party for [the boys]?

A. Yeah. Uh-huh.

Q. Why didn't you give her more information about that?

A. More information? You see like, number one, you know—and I didn't even have any money, you know, to throw a party and—and, plus, I got bills like rent and stuff.

Q. But, didn't Ms. Pflugrad . . .

A. Yeah.

Q . . . . . ask if you needed help with paying for a cake or for a party?

 * * * * * *

Q. Do you remember Ms. Pflugrad asking you . . .

A. Yes, she did.

Q . . . . . about whether you needed some financial help with that?

A. Yeah. You say why should I, you know, come to you all, you know, and ask you all, you know, well, for some help. I mean—I mean, they are my sponsibility and—and, anyway, you know, I mean, that—I mean, I do wanna throw a party for my kids. I mean, that way, you know, I was kinda short on money—I mean, money 'cause I got to pay rent.

* * * * * *

Q. What services have you asked for from the Department?

A. What service?

Q. Is there any help you want from the Department?

A. Yeah. Uh-huh. Yeah. Some help I wanted—I wanted to ask from Department of Social Services. You know, I just wanted to—them, you know, how and what way, you know—how would I provide for my kids and all that, I mean, like they do with Vena,[20] and they don't—I mean—I mean, the only thing they want to do—you know, they want to terminate—well, I mean—excuse me—the way I feel, you know, I mean, they want to terminate my rights. Right now, you know, I'm kinda afraid of Department of Social Services.[21]

* * * * * *

Q. All right. Now, you recognize that when you testified with [your attorney] that, you, yourself, have some special learning problems. Is that correct?

A. Yeah.

Q. Okay.

A. It's my reading.

Q. It's your reading.

Now, if you were given some—some special services, do you think that you could handle the problems of taking two children and—and caring for them, aside from paying child

---

**20.** Vena is the biological mother of Tristynn and Eddie. She and Mr. F were not married.

**21.** *See* n. 17, *supra* at 19, at ——.

support, and aside from going to domestic violence classes, do you think that you—that you could raise these children and get them going every single day to school? Do you think that you could do that on your own?

A. Yes, I could.

Q. Okay. How are you going to handle the problem of—for instance, since you haven't read, if there are medicines that need to be given, how are you gonna be able to handle that problem?

A. Well—well, you see, I could read a little bit, you know. I mean, the only thing in my problem is sound the word, you know. Well, you see, like, anyway, you know, sit down with me like what time, you know—like my younger son, he probably need medicine about five o'clock in the morning, wake up and give it to him.

Q. All right. So, if you needed to give your child medicine once every four hours, how would you know to do that?

A. Every four hours?

Q. Yes.

A. Well, like watch the time and—and just give it to them.

Q. Okay. Now, do you—do you drive?

A. Yeah. Uh-huh. I got my license and everything.

Q. Do you have an automobile?

A. I did have one.

Q. How would you transport your children?

A. How I would transport my kids? Well, my father, he would let me borrow his car or I could take a taxi.

Q. Okay. Do you know where the nearest schools are to your home?

A. Nearest school?

Q. Yes.

A. Yeah.

Q. All right. How far is the school from your home?

A. They go (unintelligible) Westminster High School round about three miles.

Q. Okay. Now, for—for little kids, is there a school near-by?

A. School for little kids? There's one downtown like in front of the post office use to be at; there's one down there.

Q. Okay. Now, how do you do your shopping right now?

A. How do I do my shopping? Well, why this only me, I mean, I'm by myself, I usually eat like from my job and, plus, like on my day off, I go to the store and buy some food and stuff.

Q. Okay. Do you have a refrigerator in your home.

A. Yes, ma'am.

Q. All right. Now, with two children, have you made any plans as to how you would shop and pay for food for two children?

A. Yeah.

Q. And, what are those plans?

A. Well, I take them along with me. Well, you see, I would like—I just wanna show my kid how and what way I would shop and I would like—I mean, especially my—my oldest son and, I mean, I'd just put both of them like inside like a push cart and I just say to them, I mean, "What you want, you want cereal, and just tell me what you'd like to eat and what daddy like to eat and all that."

\*　　\*　　\*　　\*　　\*　　\*

Q. All right. Now, do you know how—do you know who young Eddie's doctor is right now?

A. Well, you see, they never told me none of that stuff. You see, I asked Ms. Dana [Pflugrad] about his—about his—about his history, like his records and stuff, and I think she gave me—gave it to me one time and that was like about a while ago and, plus, I wanted his record like—like every month, like they see little Eddie, you know, I want to get to know my son, I just wanna study their weakness and I wanna know about there—I mean, like, when they cough, you know, when they go to the bathroom, and stuff. I

mean, I just wanna know the time like when they go to sleep.

Q. Okay. All right. Now, do you know if little Eddie still has any problems because of this cyst in his brain?

A. They never tell me that.[22]

Q. Okay. Do you know if he still has—if he's behind other children in his development?

A. They did tell me that.

Q. All right. Do you—do you see that he's behind other children? Does he seem to be a little slower than other children?

A. Well, you see, Eddie—he's just that type of kid; he need like 1–0–1—1–0–1 [23] and, you see, little Eddie he's that type of kid, you know, I mean, my other son, he's all right. He—like, when I take him to the bathroom and I keep my eye on both of them.

\*　　\*　　\*　　\*　　\*　　\*

Q. All right. Mr. F, when I last was speaking with you, I was asking you about how you were going to take care of your children and we've covered feeding them and transporting them and taking to—them to the doctor's. Do you know if young Eddie has any special needs that you might need to address?

A. Well, I just wanna know how his habits is like eatin' habits, and stuff.

## REDIRECT EXAMINATION

Q. [Mr. F] has the Department explained to you in detail what little Eddie's special needs are?

A. No.

---

**22.** Ms. Ramelmeier testified previously that she had "extensive conversations" with Mr. F about Eddie's health issues, but that he showed no interest in Eddie's medical care at those times.

**23.** I infer this to be a reference to "one-on-one" attention.

Q. If they told you that you had to measure his head every day, could you do that?

A. Yeah.

Q. If they told you that you had to keep him on certain medication every day, could you do that?

A. Yeah.

Q. If the doctor told you certain things to look out for to see if he was reacting poorly to a food or to anything else, could you figure that out?

A. Yeah.

\* \* \* \* \* \*

Q. Now, do you intend to move anytime soon.

A. I was planning on to.

Q. Planning on moving out of the area?

A. Yeah. Uh-huh.

Q. Where to?

A. Probably someplace quiet.

Q. Are you gonna move out of the Westminster area?

A. Oh, no (unintelligible).

Q. Okay. Well, how come—how come you're gonna stay here?

A. Well, more close . . .

THE COURT: Let me—let me interrupt just for a second then you get right back on the same thought.

You're living on South Center Street now?

THE WITNESS: South Center Street, yeah.

THE COURT: What—what was that number?

THE WITNESS: One-fifty-two.

THE COURT: That's gotta be below Green Street going down the hill . . .

THE WITNESS: Ah, . . .

THE COURT: . . . or not?

THE WITNESS: . . . below Charles Street, right . . .

THE COURT: But, below Charles?

THE WITNESS: ... beside the church?

Yes, sir.

THE COURT: Okay. A little noisy in there, isn't it?

THE WITNESS: Yes, it is, drinking, drugging.

THE COURT: Where does your mother—your parents live?

THE WITNESS: They live over on Charles Street.

THE COURT: Okay.

Okay [Mr. F's trial attorney], go ahead.

Q. So, you're not gonna move out of Westminster, but you'd like to move to a different neighborhood?

A. Yeah, a different neighborhood.

Q. Okay. Now, you said that you had a car but you don't have one now?

A. Don't have one now.

Q. Could you get one?

A. Yes, I could.[24]

Q. Why don't you have one?

A. Well, I don't have no need for a car right now because everything's so close, my job and pl ...

THE COURT: How do you get to work?

THE WITNESS: Like on my bicycle every day.

Mr. Hardesty, Mr. F's former employer at United Cerebral Palsy, testified in support of Mr. F. No longer employed by United Cerebral Palsy, Mr. Hardesty was, at the time of his testimony below, the Executive Vice President of Flying Colors of Success, Inc., a private non-profit organization serving people with disabilities. He had worked full-time since 1983 with people with disabilities.

Based on his work experience with developmentally disabled *married couples* with children in the Washington and Balti-

---

**24.** Mr. F testified earlier he could not afford to have a telephone in his townhouse. Thus, there may have existed for the trial judge just cause to doubt the certitude of Mr. F's apparent conviction that he could "get" and maintain a car.

more areas,[25] he opined that the Developmental Disabilities Administration (DDA) of the Maryland Department of Health & Mental Hygiene (DHMH) offered "a variety of different services" that "involve drop-in support supervision or assistance in the individual's ... or family home based on his or her individual needs." Such services, however, were not "set-up for somebody that needs around-the-clock supervision." Mr. Hardesty "thought" Mr. F would be eligible for and benefit from these types of DDA services, which he characterized for the trial judge as "help with budgeting, [and] certain other things that you and I take for granted, but wouldn't necessarily keep us from living independently in the community."

After criticizing Dr. Blumberg for offering his opinion of Mr. F's parental fitness based only on 3 hours of clinical interviews of Mr. F,[26] Mr. Hardesty suggested that such analysis of developmentally disabled persons by PhD.'s and M.D.'s served only to emphasize the negatives and overlooked the strengths of their study subjects.[27] According to him, the medical professionals simply end-up institutionalizing people, many of whom, had a more pro-active and positive approach been utilized, could live in the community-at-large with varying degrees of external support. Advocates for the developmentally disabled, such as the witness, argue for concentrating on the strengths of the disabled individuals and viewing them in their home and work environments, not strictly in clinical settings.

Mr. Hardesty acknowledged that Mr. F "has some obvious deficiencies." Invited by the trial judge to list Mr. F's defi-

---

25. He was unaware of any developmentally disabled adults, married or single, living in the Westminster area who had children.

26. Mr. Hardesty was unaware that Dr. Blumberg also had received and reviewed DSS's extensive files on Mr. F and the children.

27. Mr. Hardesty was accepted by the court as an expert on "developmental disabilities" for purposes of his critique of Dr. Blumberg's methodologies and opinion.

ciencies and then his strengths, Mr. Hardesty failed to respond to the inquiry about deficiencies, but instead identified as Mr. F's strengths: trustworthiness, a strong work ethic, a hard worker, and a desire to help other people.

In cross-examination, Mr. Hardesty acknowledged that he had never seen Mr. F with his children. He also seemed to contradict his earlier testimony regarding DDA not offering around-the-clock support services to developmentally disabled persons,[28] yet he appeared to concede that his current employer, Flying Colors of Success, offered its services only to adults without children.[29] Redirected to his criticism of Dr. Blumberg's task and opinion, Mr. Hardesty, grudgingly admitting that Dr. Blumberg was not asked to perform a "developmental disability analysis, but a psychological and parenting assessment," maintained that Mr. F may have tested higher or better had Dr. Blumberg interviewed him in a more familiar setting to Mr. F.

---

**28.** Q. And, you talked about the supports that might be available in the community for him through Developmental Disabilities Administration and that's a part of the Department of Health and Mental Hygiene, correct?
A. That's correct.
Q. That's not a part of the Department of Human Resources or Social Services?
A. No.
Q. And, you said that they're not—they don't have round-the-clock supervision available?
A. There are all levels of supervision available through D—D.D.A. Flying Colors of Success is licensed to provide a variety of different services. We have, up to very recently, provided drop-in supervision and supports which may entail six or seven hours a week to somebody and we also, on the other end, have supervision that's twenty-four hours a day with awake-overnight supports.
Q. And, that would be for peo—people with children—young children?
A. It's—it's for—it's for adults right now.

**29.** See n. 28 supra. Also, in light of Mr. F's more refined appellate criticism of DSS for not tailoring its services to his needs, it should be noted that Mr. Hardesty, Mr. F's witness, former employer, advocate, and old friend, admitted that he failed to talk to Mr. F about applying for any services that DDA might offer.

Invited to opine on a time line for the prospects of Mr. F becoming a fit custodial parent, Mr. Hardesty explained during cross-examination:

Q. Okay. Now, with regard to that, the issue of why Mr. F wasn't referred for additional services, if Mr. F were referred to any other organization for additional services, how long do you think it would take him to become an appropriate parent for his children?

A. I don't know what an appropriate parent is.

Q. Well, I don't know what an appropriate parent is either.

If additional services were given to—to Mr. F, is it likely that he'll be able to provide for the needs of his children within say a three-to-six month period?

A. I'm thinking three to six months is an awful quick period of time.

\* \* \* \* \* \*

Quick. I mean, that's a short period of time. I—you know, I think that if [Mr. F] could access the supports available within six months to a year, he could develop a number of the skills. The—the supports that—that are funded through D.D.A. are ongoing supports. Usually you get into their system. They don't just forget about you after six months or a year, you know. There're—there're folks that may receive a Thousand or Two Thousand Dollars in supports across the whole year. That may be somebody stopping in to check on them once a week, or something like that. D.D.A. has the resources for these kinds of things and if [Mr. F] needs . . .

Q. Do you—do you think that Mr. F would need somebody to come into his home twenty-four hours a day or what kind of services, based on your observations of Mr. F—what kinds of services would he need?

A. I would believe that [Mr. F] would need some supports that are of a drop-in nature, maybe ten/fifteen hours a week, you know, check on [Mr. F] to see if he needs any supports with anything, if he's got questions, if one of the children is displaying this kind of behavior or a symptom or something,

this happens or that happens at school or at day care, or whatever, and [Mr. F's] unsure about it ... There—there would be a resource person with—with things that he may not know about, but that resource could also be for [Mr. F] to help him with shopping to make sure he's making good nutritional decisions for the—for the kids when he's shopping. It could be helping [Mr. F] with his personal finances. It could be helping [Mr. F] with any entitlements for himself or the children. Drop-in supports can address any number of issues that—that [Mr. F] would—would need some—some assistance with.

Q. Do you think that this is something the Department of Social Services would normally provide to someone with developmental delays?

A. I'm not familiar with what DSS does. Generally, there's a pretty significant separation between DSS, DHR, and the Developmental Disabilities Administration. We—I mean, we—we work with DSS for entitlements for people that are in our program but, by and large, we don't access any other services available through DSS. [Mr. F], if he was in the DDA funding system, [he] would have a services coordinator or case manager assigned to him who is, basically, an expert in developmental disabilities. [He] would receive support through an agency and he would also receive periodic follow-up from people at the regional office of DDA.

Ms. Peggy Roland testified next for Mr. F. By work and family experience, Ms. Roland had become a special education teacher and advocate for developmentally disabled persons. Although she met Mr. F initially several years earlier while performing volunteer work with Special Olympics, her current and relevant exposure to him, and his children, came as a result of being asked by a DSS caseworker to consult on Mr. F's and his children's situation.[30] Asked what services she provided to Mr. F over the last 2–3 months,[31] she replied:

---

30. Ms. Roland was a DSS employee herself at the time.

31. Her testimony was given on 20 July 1999.

I have, I hope, helped Mr. F by becoming an advocate for him on my own time, I'm doing this strictly on a personal basis, and helping him to find services within the community, also to help him with some of his reading, to understand and interpret documents, information that he would need—excuse me—also, to develop some skills—some life skills, that he may be able to use to maintain his personal life better, using a calendar, getting other supports, financial service, advising, that kind of thing.

She thought her efforts resulted in Mr. F not being so hesitant in asking for help and information when he needed it. She described in a positive light her observations of two of Mr. F's most recent visitations with his sons at DSS (a combined time of less than 3 hours).[32]

Asked by Mr. F's trial counsel to describe what kind of programs were available in the "community at large" to help Mr. F if he were to gain custody of his children, Ms. Roland responded:

I'm not sure that I can give a very, very informed answer, fortunately, that's not something I've gotten into in my personal life yet, my daughter is not a parent yet.[33] But, I do know that financial advising-type services are available, any of the family support programs, independent living programs available through different agencies, Change, Flying Colors to Success, Target, ARC, and they are constantly developing new and different support services for custodial parents that would require, I'm sure, a lot of intense services. But, I believe that the questions could easily be asked, but I know that support is available for Mr. F as an individual in the community.

When asked on cross-examination, however, whether the "intense services" she referred to were "twenty-four hour super-

---

**32.** She conceded on cross-examination that there had been "a hundred to two hundred" such visitations, but she had observed only two of them.

**33.** Ms. Roland's daughter, 22 years old at the time of the hearings below, is developmentally disabled.

vision kind of services," she stated she could not answer the question if the object were to support a custodial parent. She acknowledged she was unable to address what actual parenting services might be available. Probing further regarding the availability of other support services in the Westminster area, the following exchange occurred during cross-examination:

Q. Okay. Are you aware, does—does the ARC—the Association For Retarded Citizens, do they offer parenting classes specifically addressed to—to developmentally delayed parents?

A. I'm sorry, I can't answer the question. But, I do know that, within the Westminster community, there are several families where one parent or the other is developmentally disabled ...

Q. And—and, they need ...

A .... and they are ...

Q ....—those families would offer assistance to other families?

A. Oh, I think that's a very strong possibility, yes.

There's a—if I may—there's a—a program within several of the agencies, I know of at least two, it's called Community Supported Living Assistance, and that's a program designed to help a person with disabilities maintain their level—appropriate level of independent living, and the program is designed to meet the needs of the individual, and I think that—I strongly believe that Change, Target, Flying Colors, and ARC would all be very interested and would do whatever they could, financially, as—as well as staff-wise, to develop a program to support a parent in their attempt to be a parent.

Even the Majority opinion, op. at 694, apparently acknowledges that the best that can be said for Mr. Hardesty's and Ms. Roland's testimony is that "[t]he evidence is unclear as to whether additional services, specific to petitioner's needs, would bring about lasting parental adjustments facilitating reunification."

Although unqualifiedly optimistic, on a personal level, regarding Mr. F's future ability to acquire additional or more refined living skills and, with support, cope successfully with the emerging needs of his growing children, Ms. Roland was less optimistic that he was ready to assume custody presently:

Q. Ms. Roland, do you believe that, were Mr. F to be permitted to have unsupervised visitation with his children, would he be able to understand and address the children's medical needs if there—if there were medical problems?

A. At this point in time, it's something I've talked to Mr. F about, I do not think that would be advisable for unsupervised visits because of the possibility of hurt children and knowing what to do.

Q. All right. So—so, at this time, you don't believe that Mr. F has the judgment to address medical needs for the children?

A. No, I don't.

Mr. F's final witness, Margaret F., his aunt and Eddie's foster mother, testified that she would like to adopt Eddie, and Tristynn if given the chance. She expressed her intention to allow Mr. F, as well as Mr. F's family, to play a role in the children's lives so they would know their heritage.[34] Asked by the court whether she thought Mr. F could handle the boys by himself, Margaret F., who has known Mr. F for 28–29 years, replied, "I think, at this time, he's kind of unstable ... You know, if he starts to do things ... functions where he can learn a little bit more with his abilities, I think, you know, that he would be a better person."

This is the record that was before the trial judge. On appeal, Mr. F's appellate counsel and Amicus seek informally to supplement that record through their briefs, and understandably so. The limited attack mounted on Dr. Blumberg's opinion in the circuit court has ballooned into a legal question

---

34. At some point in the proceedings below, Mr. F's trial counsel had advanced an alternative that Margaret F. and her husband could adopt both boys, a possibility Mr. F might accept. This notion did not bear fruit ultimately.

beyond all proportion to the objection actually made below. The availability of support services asserted on appeal has taken on a crystalline clarity and certainty that belies what the trial judge was told below. Essentially unargued statutes and laws have become the foundation for legal arguments, augmented by law review articles,[35] to the end that we should reverse the judgment below on points of law not placed fairly before or decided by the trial judge.

I do not blame Mr. F's appellate counsel or Amicus for trying. The zeal of their advocacy is admirable and understandable. The client is appealing and, obviously, the arguments are beguiling. Perhaps, if Mr. F's appellate and Amicus counsel had tried the case in the trial court, we would have the record before us they argue in their briefs, from which the Majority opinion borrows heavily. Unfortunately, the case they argue is not the record before us, nor was it before the trial judge.

I fault the Majority of this Court, however, for listening to the music, but not the words. The Majority opinion succumbs to the siren call of the Amicus brief, in particular, and becomes a bully pulpit for the promotion of select societal, moral, and legal truths and values (most of which reasonable people, whether judges or not, recognize as self-evident), but which is not justified by an objective reading of the record nor implicated by the reasons DSS sought, and the circuit court granted, termination of Mr. F's parental rights. Tristynn and Eddie originally were declared children in need of assistance (an adjudication that was not appealed) because Mr. F was unable to care properly for them. DSS presented a wealth of evidence why that situation was unlikely to change in the foreseeable future.[36] The trial judge was unpersuaded by Mr.

---

**35.** Some of which may be, in academic and experiential parlance, more learned than others. For example, a piece from a 1995 California Law Review, cited and quoted by the Majority (from the Amicus brief) op. at 674–675 and 685, n. 17, appears to have been authored by a law student.

**36.** The Majority appears to extend the relevant temporal time frame for consideration under FL § 5–313(d)(i) (the impact of the parent's dis-

F's evidence to the contrary. The Majority opinion, however, at various points, implies, in digressive homilies, that DSS's "drive toward termination" (Maj. op. at 683) may have been influenced by Mr. F being considered "poor" (Maj. op. at 669, 673–674, 686, 700), and/or "illiterate" (at 686); or that DSS was paying blind obeisance to federal regulatory or funding requirements (at 669, 700);[37] or that the trial court and DSS avoided a proper weighing of Mr. F's rights and the best interests standard because they feared the uncertainties inherent in ever returning the children to him (the "safer course" doctrine) (at 669). Nor does the termination of Mr. F's parental rights, on this record, constitute an intentional or inadvertent diminution of the rights of the developmentally disabled as a class of our citizenry (Maj. op. at 669, 674–675, 683–684). This case involves an appraisal of a particular developmentally disabled parent, his particular children, and on a particular record.

The Majority opinion ignores much of what our job is about. It cherry-picks certain facts, ignores others, and finds a few new ones as suits its objective. It, in at least one instance, strategically edits an authority[38] to avoid a principle, previous-

---

ability on child care must endure "for long periods of time") when it concludes, op. at 697–698, that "there was not ample evidence to properly conclude that Mr. F's disability, even if it exists, renders him *permanently* incapable of caring for his children in an unsupervised setting." (Emphasis added).

**37.** It seems fairly clear, at least from the trial court's perspective, that federal funding and oversight requirements were not driving its consideration of this case. At a 29 January 1999 hearing, when DSS's counsel proffered for the record various reasons why the petition was "long overdue in being ruled upon," so that the "federal auditors" would know "that the delays are appropriate in this case," the trial judge commented, "[w]ell, I could care less about the federal auditors."

**38.** In the Majority opinion's extensive block quote (Maj. op. at 675–678) from the Court's opinion in *In re: Adoption/Guardianship No. 10941*, 335 Md. 99, 103–06, 642 A.2d 201, 203–05 (1994), the following highlighted sentence is omitted (op. at 677–678):

The overriding theme of both the federal and state legislation is that a child should have permanency in his or her life. *The valid premise*

ly acknowledged by this Court, that cuts against the Majority's reasoning. It disdains even to state the issues framed by Mr. F, upon which certiorari was granted, in favor of its own unstated conceptualization of the "questions" it would like to answer.[39] Finally, it strives to make out of this record something that is not present in this case, the trampling of a parent's right to raise his child.

The trial judge's conclusions were supported by clear and convincing evidence, as recounted *supra*. Clear and convincing evidence, as explained in *Berkey v. Delia*, 287 Md. 302, 318, 413 A.2d, 170, 177–78 (1980), involves "a degree of belief greater than ... a preponderance of the evidence, but less than ... proof beyond a reasonable doubt.... It has been said that [such] proof must be 'strong, positive and free from doubt' and 'full, clear and decisive.' " (citations omitted). DSS met that burden.

---

*is that it is in the child's best interest to be placed in a permanent home and spend as little time as possible in foster care.* Thus, Title 5 of the Family Law Article seeks to prevent the need for removal of a child from its home, to return a child to its home when possible, and where returning home is not possible, to place the child in another permanent placement that has legal status. [Some citations omitted.] Of course, the omitted language is exactly the principle served by the trial court's decision in the instant case.

**39.** Mr. F's certiorari petition framed and argued one question:

Whether the lower court was clearly erroneous in its finding that petitioner's intellectual limitations required termination of his parental rights, absent a determination of abandonment, abuse, or neglect.

In his brief to the Court, Mr. F presented and argued two questions:

I. Whether the trial court erroneously found that the [petitioner] had a disability that rendered him consistently unable to care for the immediate and ongoing physical or psychological needs of the children[?]

II. Whether the trial court erred in finding that the appellee provided [petitioner] with timely and adequate services to facilitate reunification of [petitioner] and his children[?]

Obviously, Mr. F conceived his appellate challenges as attacking the sufficiency of the evidence. The Majority's omission of these questions from its opinion becomes significant in light of Petitioner's and Amicus's supplementation of the record and the Majority's tendencies toward appellate fact-finding and substituting its weighing of testimony and documents for that of the trial judge.

The Majority opinion directs, in essence, a "do-over" and justifies that result by engaging in its own fact-finding.[40] The transparency of the Majority opinion's supplantation of the trial judge's fact-finding role is not concealed adequately by its digressive ~~legal~~ discourses on the unchallenged legal principles applied in a termination of parental rights case. Of course, what makes this case inherently challenging is that it involves a developmentally disabled parent. It is difficult to imagine how the tensions between the legal principles of the best interests of the children and the constitutional right to raise one's children could be heightened further. This is precisely why disciplined appellate analysis is so critically necessary lest we become swept up in the rhetoric.

---

**40.** Examples of the Majority opinion's factual embellishments and substituted judgment conclusions include:

(a) The Majority opinion, op. at 19–20 and again at 686 and again at 694–695, states that the application and use of the Minnesota Multi-Facet Personality Inventory test, which Dr. Blumberg did not administer to Mr. F because he could not read adequately, "are not limited to people that can read." There is no evidence in the record to support this conclusion.

(b) Extrapolating apparently from the facts that Mr. F earns $6.50 per hour from his present job, rents a 2 bedroom townhouse (but is unable to afford a telephone in it), and possesses a bicycle, the Majority concludes he is "able ... to now financially provide for Tristynn and Edward's care and maintenance." (op. at 701).

(c) The Majority seems to attribute to DSS, op. at 701–702, testimony "that reunification in the future was reasonably possible, if not probable." It fails to note, however, that this was not DSS's position in this matter, but rather that of one of Mr. F's witnesses, Peggy Roland (see Dissent, supra, at 698–701, for discussion of Mr. Roland's views).

(d) Of greatest significance, the Majority opinion states certain major factual conclusions at 700 ("[Mr. F] may well be able, with properly tailored services, to care for his children."), 700 ("CCDSS had at its disposition better suited services for petitioner"), and 701 ("[Mr. F's] ability to care for those with severe disabilities [while employed at United Cerebral Palsy in the early 90's] might be an indicator that petitioner's immediate parenting problems, if they exist, would dissipate within the near time, with the aging of the children and petitioner's continued growth in his parenting skills."). For the Majority to reach these conclusions necessarily requires it to place itself in the shoes of the fact-finder and elect to credit Mr. F's evidence, rather than that adduced by DSS. These are prime examples of impermissible appellate fact-finding.

The trial judge was correct as to the applicable law and he applied that law to the facts as he found them to be. Neither he nor DSS violated Mr. F"s parental rights, except insofar as it may be said the law permits when the "best interest of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *In Re Mark,* 365 Md. 687, 706, 782 A.2d 332, 343 (2001); *Boswell v. Boswell,* 352 Md. 204, 219, 721 A.2d 662, 669 (1998). This is such a case.

I would affirm the judgments of the Court of Special Appeals and the Circuit Court for Carroll County. Judges RAKER and WILNER authorize me to state that they join in this dissent.